Wm. B. GRUBER and Norma M. Gruber, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Eva R. MAYER, Executrix of the Estate of Edwin E. Mayer, Deceased, and Eva R. Mayer, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Harold J. GRAVES and Beulah F. Graves, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Thomas O. MEYER and Pauline Meyer, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Augusta KELLY, Plaintiff,

v.

UNITED STATES of America, Defendant.

Estate of Raymond F. KELLY, Deceased, Augusta Kelly, Residuary Legatee, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. Nos. 8055–8060.

United States District Court D. Oregon.

May 31, 1957.

As Amended Jan. 2, 1958.

William H. Kinsey (Mautz, Souther, Spaulding, Denecke and Kinsey), of Portland, Or., for plaintiffs.

Charles K. Rice, Asst. Atty. Gen., James P. Garland and Walter B. Langley, of Washington, D. C., and Clarence E. Luckey, U. S. Atty., Edward J. Georgeff, Asst. U. S. Atty., Portland, Or., for the United States.

GUS J. SOLOMON, District Judge.

These are actions to recover taxes paid on patent royalty income received in 1950, 1951 and 1952, and are based on the theory that the royalties constituted capital gains and not ordinary income. One plaintiff, Gruber, is the inventor of the View-Master, a patented device for viewing stereoscopic slides. Although other patents came to be covered by the agreement under which the royalties were paid, the View-Master patent accounted for the great bulk of the royalties, and the other patents will not be mentioned further. The other eight

plaintiffs, whom I shall call the Sawyer partners, were first partners and subsequently stockholders in the firm which developed and promoted the View-Master.

In 1938, Gruber, a Portland piano tuner and camera enthusiast, conceived an idea for a stereoscopic device for viewing photographic transparencies mounted in a circular card which would give the viewer the illusion of three dimensions. While visiting the Oregon Caves that year, he met another tourist, Harold Graves, and told him of his idea. Graves, who was in the photographic supply business, became interested, and later he and his associates formed a partnership called Sawyer's, which informally undertook to develop the device called the View-Master and work out its commercial possibilities.

Beginning in 1939, Gruber and Sawyer's worked together to develop the View-Master, without having concluded any agreement as to their relationship. The View-Master patent, No. 2,189,285, was issued to Gruber on February 6, 1940, and limited commercial production was started in that year in order to test the market. Public acceptance was both immediate and enthusiastic. A small advance on royalties was given Gruber in 1941, but no agreement was concluded between Gruber and Sawyer's until 1942.

In the 1942 agreement, Gruber agreed to grant Sawyer's an undivided one-half interest in the patent to compensate it for its expense in developing and obtaining the patent and in developing mechanical processes to produce it. This agreement also gave Sawyer's a license to manufacture and sell under Gruber's retained one-half interest. However, Gruber reserved the exclusive rights to the educational field and to the German market.

The next agreement was made in 1944. It was practically identical to the 1942 agreement except that it eliminated Gruber's reserved rights to the educational field and the German market.

Sometime later, Sawyer's decided that it was not large enough to handle the foreign market in addition to its ever-increasing United States business. At a meeting of the Sawyer partners in 1946, they agreed to exploit the foreign field through Western Photo Supply Company, a corporation whose stock was then owned entirely by some of the Sawyer partners. Sawyer's and Western Photo entered into a contract by which Sawyer's sold its one-half interest in the patent to Western Photo for the book value of the patent and an exclusive license back to produce under it in the United States. Sawyer's would pay all royalties to Western Photo, which in turn would pay Gruber one-half thereof, the amount to which he was entitled under the 1944 agreement. The remaining one-half was to be retained by Western Photo for a period of three years for use in exploiting the foreign market. Thereafter, such remaining royalties were to be distributed to the Sawyer partners as individuals in specified percentages. Gruber was not a party to this transaction between Sawyer's and Western Photo. The "Sawyer partners" who are plaintiffs in this case were the partners in Sawyer's at that time.

Later in 1946, Sawyer's incorporated in order to obtain additional bank credit. The partners were issued shares of stock in the corporation, Sawyer's Inc., in exchange for their partnership interests.

In 1949, Western Photo, Sawyer's Inc., Gruber and the Sawyer partners entered into a new agreement. This agreement recited that it superseded all previous agreements, that it embodied all points of agreement between the parties and that there was in effect no other agreement relating to the patent between any of the parties. The agreement further recited that title to the patent was in Western Photo as trustee, with the beneficial ownership one-half in Gruber and one-half in the Sawyer partners as individuals. Western Photo licensed Sawyer's Inc. to use the patent for the manufacture and sale of the View-Master in the United States, the royalties to be paid to Western Photo for distribution to the beneficial owners.

This agreement was modified effective January 1, 1950, to provide that Sawyer's Inc. should distribute the royalty payments directly to Gruber and the Sawyer partners rather than through Western Photo.

### Gruber

Gruber contends that he is entitled to capital gains treatment of royalty income received by him in 1950–2 under the 1949 licensing agreement because this agreement constituted a sale of a capital asset within the meaning of § 117, Internal Revenue Code of 1939, 26 U.S.C. § 117. The Government oppose this contention on the ground that the 1949 license was not sufficiently comprehensive of Gruber's rights under the patent to constitute a sale under § 117.

The Government relies primarily on the case of Waterman v. Mackenzie, 1891, 138 U.S. 252, 11 S.Ct. 334, 335, 34 L.Ed. 923. This case defined the whole patent as "the exclusive right to make, use and vend the invention or discovery throughout the United States * * *." It held that to quality as an assignment which passes title to the patent as opposed to a mere license, a transfer must convey (1) the whole patent, (2) an undivided part or share thereof, or (3) the exclusive right under the patent within and throughout a specified part of the United States. 138 U.S. at page 255, 11 S.Ct. at page 335. The substance and not the form of the transfer controls.

The 1949 license agreement gave Sawyer's Inc. " * * * the sole and exclusive right and license *to use* [the patent] *for the manufacture and sale* within the United States of America * * *" (emphasis added) The Government contends that this agreement does not meet the Waterman test for an assignment which passes title because it fails to transfer an unlimited right to use the patent in addition to the right to manufacture and sell.

In order to escape the effect of Waterman, Gruber urged that the agreement was ambiguous, and he offered parol evidence in support of his contention that the agreement should be interpreted to mean, "use, manufacture and sell." I find no reason to consider parol evidence since the agreement is clear and unambiguous on its face and there is no latent ambiguity. I find that it grants the right to use only insofar as necessary to manufacture and sell.

The Waterman case held that a license which granted the right only to manufacture and sell, but not the right to use, patented fountain pens was not sufficiently complete to pass title to the patent. The license here was no broader than that in Waterman. If the retained remaining use value of the fountain pen patent made the transfer of rights incomplete in Waterman, it would follow that Gruber's transfer was also incomplete.

Waterman was not a tax case. The precise question involved was whether a licensee could sue a third party for patent infringement without joining the licensor as a plaintiff. At least one circuit has made capital gains treatment of patent licenses depend upon the answer to this question. Broderick v. Neale, 10 Cir., 1953, 201 F.2d 621.

Other jurisdictions, including this circuit, have noted that Waterman was not concerned with tax matters and have questioned its authority in the tax field on that ground. Bloch v. United States, 2 Cir., 1952, 200 F.2d 63; United States v. Carruthers, 9 Cir., 1955, 219 F.2d 21. Capital gains treatment has been allowed in cases in which the licensor retained many more rights than permitted by the Waterman criteria for the passage of title. Kavanagh v. Evans, 6 Cir., 1951, 188 F.2d 234; First National Bank of Princeton v. United States, D.C.N.J.1955, 136 F.Supp. 818.

The Court of Appeals for this circuit in United States v. Carruthers, 9 Cir., 1955, 219 F.2d 21, considered a claim for capital gains treatment of a patent license to make, use and sell which was limited to the tuna industry. The Government argued that an industry limitation was not permitted under the Waterman test. However, the court held that the Waterman standard of the "whole" patent rights was met by the license be-

cause the testimony showed that the patents had no established commercial value except for processing tuna and no attempt had been made to use them outside that industry. The court refused to speculate that such use might be valuable.

The same is true in the present case. The right to use the patented structures, apart from their manufacture or sale, was not shown to have any commercial value nor had any attempt been made to exploit such use. The Government suggested that the patented structures might be rented, but the commercial feasibility of such an undertaking appears to be highly improbable, particularly in view of the low prices at which they are sold. In my opinion, the license to manufacture and sell included everything of substantial value in the patent.

The Carruthers case dealt with a license which was defective under Waterman with respect to area. This case involves a license which fails to comply with the "make, use and vend" requirement. However, the test of provable substantial value in Carruthers is equally applicable to this case. I therefore find that the 1949 agreement qualifies as a sale and is entitled to capital gains treatment under § 117 of the Internal Revenue Code of 1939.

With regard to the royalties received in 1951 and 1952 only, Gruber is entitled to recover for an additional reason. In 1956, IRC 1939 was amended by adding § 117(q) which was made retrospective to tax years beginning after May 31, 1950. The new section provides for capital gains treatment of patent licenses transferring "all substantial rights" under certain conditions.

The Senate Committee report on an almost identical section in the 1954 Internal Revenue Code (26 U.S.C. § 1235), which was enacted earlier, gives the following explanation for the phrase "all substantial rights":

"Moreover, the courts have recognized that an exclusive license agreement in some instances may constitute a sale for tax purposes even where the right to 'use' the invention has not been conveyed to the licensee, if it is shown that such failure did not represent the retention of a substantial right under the patent by the licensor. It is the intention of your committee to continue this realistic test, whereby the entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones." 1954 U.S.Code Cong. & Adm.News, pp. 4621, 5083.

This test embodies the Carruthers concept of provable substantial value. My finding that the 1949 licensing agreement was a sale within the meaning of § 117 under the Waterman case as interpreted by Carruthers is equally applicable to the agreement as considered from the viewpoint of § 117(q).

### The Sawyer Partners
#### A. Variance between Claim and Complaint.

The Sawyer partners also seek capital gains treatment of royalty payments made to them during 1950–2 by Sawyer's Inc. under the 1949 agreement. Their contention is that the 1949 agreement was a licensing agreement by which they surrendered all substantial rights in the patent to Sawyer's Inc. through Western Photo as nominal grantor.

The Government objects to their reliance on the 1949 agreement as the sale or exchange which produced the alleged capital gains because in their refund claims filed with the Commissioner, they relied on the 1946 agreement. The Federal Tax Regulations require that claims for refund shall set forth in detail each ground upon which a refund is claimed, and facts sufficient to apprise the Commissioner of the exact basis of the claims. 1956 Federal Tax Regulations, 1939 Code Regs. § 39.322–3(b).

In the absence of a waiver by the Government, refund claimants are not entitled to rely at the trial stage on theories of law or fact which they did not assert in their claims for refund. Real Estate-Land Title & Trust Co. v. United States, 1940, 309 U.S. 13, 60 S.Ct. 371, 84 L.Ed. 542; United States v. Felt & Tarrant Manufacturing Co., 1931, 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025; Dascomb v. McCuen, 2 Cir., 1934, 73 F.2d 417.

The change in approach in this case between the claim for refund filed with the Commissioner and the complaint in this court is fundamental. Although the legal theory remains the same, the facts relied upon to make the theory operative are completely different. The Sawyer partners relied upon the 1946 agreement in their claims for refund, and therefore they may not in this court rely on the 1949 agreement.

Plaintiffs now contend that the claims were broad enough to put the Commissioner on notice of the 1949 agreement and that he was therefore required to consider it. They also point out that their intent to rely on the 1949 agreement at the trial was revealed to the Government attorneys well in advance of trial and that such attorneys were neither prejudiced nor surprised in their handling of the case.

The rule against variances is designed to give the administrative agency full opportunity to. examine claims and pass upon their validity with a view to reducing litigation. The present case involved a complicated series of agreements and changes in organization over an eleven-year period. The available facts could have been interpreted in many ways from a tax point of view.[1] In a case so involved, the refund claimant should give the Commissioner the facts and his theory, and he should also explain how the facts support his theory. The Commissioner is not bound to consider whether the same theory could properly be applied to other facts appearing in the file. There is nothing in the refund claims or surrounding circumstances to indicate that the Commissioner necessarily or even probably considered the possibility that capital gains were produced by the 1949 agreement.

This is not a case in which the Government has waived or is otherwise estopped to assert the variance. In contrast to the situation in McKesson & Robbins v. Edwards, 2 Cir., 1932, 57 F.2d 147, cited by plaintiffs, the claims filed with the Commissioner were not amended while they were still in his hands. Here reliance on the 1949 agreement was asserted for the first time after the actions had been instituted and the Commissioner's files had been turned over to the Department of Justice. This is precisely the evil which the rule against variance was intended to prevent.

### B. Merits of Claims.

Although the question of variance disposes of these actions, the Sawyer partners are likewise not entitled to prevail on the merits.

The one-half patent interest given the Sawyer's partnership by Gruber in 1942 was a group of rights which included, among others, the exclusive right to manufacture and sell in the United States. It is this exclusive right which constitutes the capital asset which produced the royalties paid by Sawyer's Inc. to the Sawyer partners. If those royalties are entitled to capital gains treatment in the hands of the partners, there must have been a transfer of the asset by the partnership or the partners and the royalties must have been received from the buyer of the asset in exchange therefor. I find neither such transfer nor such payment.

The 1946 agreement is phrased as a sale of the entire patent by Saw-

[1]. In the course of these proceedings, plaintiffs have presented at least two basically different analyses of the facts, both in support of capital-gains treatment. They will be discussed in a later portion of the opinion.

yer's to Western Photo with a license back to Sawyer's of the exclusive United States rights, the capital asset with which we are concerned. From a tax point of view, no transfer of the United States rights resulted from this transaction. Sawyer's had such rights both before and after the agreement. Furthermore, the royalties under that agreement were to be paid by Sawyer's, the seller of the asset, and not by Western Photo, the buyer. Even though under the agreement Western Photo obligated itself to pay these royalties over to the Sawyer partners after three years had elapsed, it was only agreeing to act as a conduit for payments by Sawyer's to its own partners. To permit capital gains treatment of such payments would be to allow partners to convert ordinary income to capital gains merely by transferring to a third party the bare legal title to a partnership capital asset and then distributing ordinary income from such property to themselves as individuals through the third party as a conduit. I am therefore of the opinion that the 1946 agreement with Western Photo did not generate capital gains to the Sawyer partners.[2]

Later in 1946, Sawyer's Inc. was organized. The Sawyer partners transferred their interests in the partnership assets to the corporation in exchange for stock. These assets included the United States rights to the patent but did not include the right to receive royalties under the 1946 agreement with Western Photo, for these latter rights were held by the partners as individuals. No contention is made that this transfer resulted in the royalty payments for which capital gains treatment is requested in this case.

Just prior to the 1949 agreement, Western Photo held legal title to the patent subject to an exclusive license of the United States rights to Sawyer's Inc. The Sawyer partners as individuals were entitled to receive royalties through Western Photo under the 1946 agreement once the three-year period had elapsed.[3]

The 1949 agreement purports to effect a license of the United States rights granted by Western Photo as trustee and the Sawyer partners as beneficial owners to Sawyer's Inc. in exchange for royalties to be paid to the Sawyer partners as individuals through Western Photo.[4]

■■ In spite of the recitals of the 1949 agreement and the claims of the Sawyer partners, I find that the Sawyer partners did not transfer any rights to Sawyer's Inc. by the 1949 agreement which they had not already transferred to it at the time of its incorporation. Thus the 1949 agreement, like the 1946 agreement, brought about no change in the ownership of the United States rights. Therefore the Sawyer partners are not entitled to capital gains treatment on any royalties paid under either of these agreements.

The actions of all plaintiffs except the Grubers are dismissed.

2. In the pretrial order, the Sawyer partners expressly denied any intent to rely on the 1946 agreement as producing capital gains. In their motion for reconsideration after the court announced its decision, the Sawyer partners again commenced to rely on the 1946 agreement.

3. This opinion should not be regarded as a determination of the validity or reach of the 1946 agreement as between the parties thereto. For the purposes of this case it was considered in the light most favorable to the claimants.

4. In 1950, a supplemental agreement was made whereby the royalty payments were to be made by Sawyer's Inc. directly to the Sawyer partners and not through Western Photo.