**ALLIED CHEMICAL CORPORATION,**
Plaintiff-Appellant,

v.

**UNITED STATES of America,**
Defendant-Appellee.

**No. 49, Docket 30508.**

United States Court of Appeals
Second Circuit.

Argued Oct. 24, 1966.

Decided Jan. 6, 1967.

Joseph D. Becker, New York City (Thomas D. Kent; New York City, of counsel), for plaintiff-appellant.

Laurence Vogel, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., S. D. of New York, New York City, Grant B. Hering, Asst. U. S. Atty., Harry Baum, Atty., Dept. of Justice, of counsel), for defendant-appellee.

Before LUMBARD, Chief Judge, MOORE and KAUFMAN, Circuit Judges.

MOORE, Circuit Judge:

In 1940, Dr. Lawrence H. Flett, an employee of the appellant, Allied Chemical Corporation (Allied), began research on a chemical which prevented the formation of mold on foods (the Antimycotic). In 1943, Allied made samples of the Antimycotic available to Marathon Corporation (Marathon), a manufacturer of packaging materials, which incorporated it into a wrapper. Further studies were subsequently conducted through the cooperation of Allied, Marathon, and Kraft Foods Company (Kraft), a major producer of cheese, and a customer of Marathon. Marathon had shown the Antimycotic wrapper to Kraft and put Kraft in contact with Allied. Dr. Flett applied for a patent on the Antimycotic wrapper, and on August 23, 1949, the Flett patent issued to Allied.

On June 3, 1950 (effective September 1, 1949), Allied granted Kraft an "exclusive" license to manufacture, use and sell the patented Antimycotic wrappers in the "cheese field" (The Kraft License). Certain provisions of this agreement limited the scope of the license granted to Kraft.

(1) The license was limited to the manufacture, use and sale of the Antimycotic wrappers in the "cheese field," and hence covered only one (1) of the twenty-two (22) claims in the patent.

(2) Allied expressly reserved the right to grant a non-exclusive license in the cheese field to Marathon (The Marathon Reservation). The proposed agreement was appended to the Kraft license.

(3) Allied retained the right to compel Kraft to sublicense anyone designated by Allied on terms set forth in a model agreement appended to the Kraft license.

(4) Allied reserved the right to terminate the license if Kraft breached any covenant or condition.

(5) Allied had the exclusive power to institute and control patent litigation. Allied and Kraft would share equally in any recoveries therein. Further, Allied retained an option to terminate the license any time that Kraft requested that Allied begin an infringement suit.

(6) Kraft could not assign any of its rights except to a successor in business.

The royalty provisions of the Kraft license called for Allied and Kraft to share equally in all royalties due from Kraft, Kraft's sublicensees, and from Marathon (if it accepted the non-exclusive license Allied planned to offer). In addition, Kraft guaranteed Allied a minimum royalty of $33,333.33 for the first 16 months of the contract (Sept. 1, 1949–Dec. 31, 1950) and of $40,000.00 for each 12-month period after that.

Allied failed to persuade Marathon to accept the non-exclusive license. In 1954, Kraft discontinued use of the wrapper pursuant to an informal directive of the Food and Drug Administration, which was not convinced of the nontoxicity of the wrappers. In 1955, because of the difficulties in getting approval of the patented wrappers, Allied abandoned the idea of exclusive licensing, and renegotiated a "non-exclusive" license with Kraft. At the same time, a "non-exclusive" license was also granted to Marathon.

The royalty payments received by Allied pursuant to the Kraft license were treated as ordinary income for the years involved, 1950–1954. Allied brought this suit in 1961 to have portions of the tax refunded on the theory that the 1949 Kraft license was in fact the sale of a capital asset, entitling Allied to treat the royalty payments as capital gain under

§ 117(j) of the 1939 Internal Revenue Code. The District Court found that the patent was a capital asset, but that there had been no sale or exchange of it.

■ The parties agree that the relevant inquiry on this appeal is whether all substantial rights under the patent were transferred by Allied in the 1949 Kraft License, thus constituting a § 117 (j) sale. One method of ascertaining what has or has not been transferred is to see what has been retained by the grantor. Cf., Young v. C. I. R., 269 F.2d 89 (2d Cir., 1959); Wing v. C. I. R., 278 F.2d 656 (8th Cir., 1960); Watkins v. United States, 252 F.2d 722 (2d Cir., 1958).

We find that enough control over, and interest in the patent had been retained by Allied to preclude a holding that all substantial rights had been transferred.

Allied retained the right and power, through the Marathon Reservation and the compulsory sublicensing clause in the Kraft license, to increase its royalty income by making the patented wrappers available to anyone, including Kraft's competitors. Allied in essence could receive royalties from users other than Kraft. Allied's sole concern was to maximize the royalty income.

At the same time, Kraft, being a user of the wrappers, might find that the competitive advantages of being the sole user outweighed the value of royalty payments from sublicensees. The fact that Kraft resisted Allied's suggestions to sublicense is some indication that Kraft may have preferred to remain the sole user. However, because of Allied's power to sublicense, and interest in doing so, Kraft lacked the control necessary to real-ize the possible competitive advantage of the monopoly inherent in a patent. Control over those who could make and use the wrappers was also considered important because they had not been approved by the FDA.[1]

■ The fact that Marathon did not take the offered license, the fact that Allied did not exercise some of the rights available to it under the license, and the fact that these rights eventually became worthless as a result of FDA disapproval are irrelevant to the present inquiry. We are concerned with the value of the rights retained or transferred at the date of the transfer. At the time the Kraft license was signed, Allied believed that Marathon would take the offered license because of the substantial rights involved. It was also believed that the FDA would approve the wrappers.

We do not attempt to distinguish between Marathon's possible rights as a licensee of Allied or a sublicensee of Kraft. They are sufficiently similar to convince us that Allied insisted upon the Marathon Reservation because it feared that Marathon would not consent to be a mere sublicensee of Kraft. Marathon had expected to get the exclusive license in the cheese field, and was somewhat annoyed to discover that Kraft, which had been introduced to the Antimycotic by Marathon, had become the exclusive licensee instead. Marathon had experience in manufacturing and using the Antimycotic wrappers, was conversant with the legal problems involved, and sold cheese packaging to "practically all manufacturers of cheese."[2] Hence, Allied wanted to come to an agreement with Marathon, and hoped that a direct li-

---

1. There were legal problems under the Pure Food and Drug Act involved in using the Antimycotic in cheese wrappers. Kraft was "afraid of somebody else getting in the business that didn't know how to handle the wrappers." (Deposition testimony of Erwin P. Snyder who negotiated the 1949 License for Kraft.) Presumably, the substance of this fear was that irresponsible use might bring about FDA disapproval of the wrappers as unsafe. Thus, it was desirable to have sufficient control to bar those considered to be irresponsible from using the wrappers.

2. Walter Dixon, Marathon's sales manager for dairy packaging in the early 1950's, testified that these included, Borden's Shefford Cheese Co., Pauley & Pauley, Swift, Armour & Co., L. B. Schrieber, Wheeler Cheese Co., the Kraft Foods, Clearfield Cheese Co., Challenge Cheese Co. and Dairy Gold Cheese Co.

cense might be less objectionable even if it did not offer much more in the way of tangible benefits.

Allied retained exclusive control over patent litigation. Kraft had no right to sue infringers. See, Schmitt v. C. I. R., 271 F.2d 301 (9th Cir., 1959); Watkins v. United States, supra. The most Kraft could do was to request Allied to bring suit against any infringer. Once Kraft had made such a request, Allied could terminate the license by granting Kraft a non-exclusive, royalty-free license. A copy of this license was appended to the main agreement. The care with which the parties drafted this clause indicates it was there for some reason. It was not a clause to ensure performance by Kraft, or otherwise to protect Allied's rights under the license. While we do not wish to speculate as to the reasons Allied may have had for retaining this power of termination, the language of the contract indicates that the parties envisaged a situation where Kraft, through no fault of its own, might have to choose between suffering an infringement or losing the valuable right to share in any royalties which the patent might produce in the cheese field.

Kraft could not assign any of its rights under the contract, except to a successor in business. This is an important factor in evaluating the substantiality of the rights retained. Watkins v. United States, supra.

As late as 1953, Allied was considering the possibility of selling the patent to Kraft. Allied found the prospect of a sale attractive because it would allow them to treat the proceeds as capital gains, and believed Kraft would be interested because of the competitive advantage which would be theirs through control of the patent. These plans show that the parties did not intend the 1949 Kraft license to be a sale, and that they believed that valuable and desirable rights of control had been withheld from Kraft in that license.

■ We do not find it necessary to decide whether the District Court was correct in its holding that the transfer of less than all the valuable claims of a patent may be a sale. Nor do we rely on the limited grounds of the Marathon Reservation alone in reaching our holding. It is sufficient to say that the aggregate of rights and controls retained by Allied, together with their own contemporaneous statements convince us that Allied neither intended nor effectuated a sale of the Flett patent to Kraft through the 1949 Kraft license. Watkins v. United States, supra.

Affirmed.