ESTATE OF GEORGE T. KLEIN, DECEASED, SHIRLEY KLEIN, PERSONAL REPRESENTATIVE AND SHIRLEY KLEIN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3533–71. Filed December 5, 1973.

*Robert M. Weiss*, for the petitioners.
*Matthew W. Stanley, Jr.*, for the respondent.

OPINION

TIETJENS, *Judge:* The Commissioner determined deficiencies in petitioners' income taxes as follows:

| Taxable year | Deficiency |
|---|---|
| 1966 | $1,829.50 |
| 1967 | 22,921.60 |
| 1968 | 79,759.04 |

This case was fully stipulated pursuant to Rule 30, Tax Court Rules of Practice. The facts which we deem necessary for decision will be referred to below.

The question for decision is whether an "Exclusive License Agreement" between George T. Klein (hereafter decedent) and Organic Compost Corp. of Pennsylvania (hereafter Pennsylvania) represents a transfer the proceeds of which qualify for capital gains treatment under section 1235.[1]

During the taxable years in issue, George T. Klein and Shirley Klein, husband and wife, resided in Milwaukee, Wis. They filed joint Federal income tax returns for the taxable years ending December 31, 1966, through December 31, 1968, with the district director of internal revenue in Milwaukee, Wis.

Decedent died on May 17, 1972, and his wife was duly appointed and qualified as the personal representative of his estate on May 26, 1972.

Decedent created a process which converts organic waste into odorless organic fertilizer. In 1956, he was granted United States Letter Patent No. 2750269, relating to that process of making organic compost.

In 1957, decedent formed Organic Compost Corp. of Wisconsin (hereafter Wisconsin), with its principal office located in Germantown, Wis. Until his death, decedent was the president and sole stockholder of Wisconsin.

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise stated.

In December 1959, Pennsylvania was formed under the laws of Pennsylvania with its principal office located in Oxford, Pa. During the taxable years in issue, decedent owned approximately 24 percent of the issued stock of Pennsylvania.

In 1968, Organic Compost Corp. of Texas (hereafter Texas) was formed under the laws of Texas with its principal office located in Fort Worth. During the taxable years in issue, decedent owned less than 25 percent of the stock of Texas.

In 1960, decedent entered into an agreement entitled "Exclusive License Agreement" with Pennsylvania. Pertinent portions of that agreement provide:

WITNESSETH THAT:

WHEREAS, Licensor is the owner of United States Letters Patent Number 2750269 relating to improvement in the process of making organic compost; and,

WHEREAS, licensee desires to acquire and licensor is willing to grant an exclusive license under said patent on the terms and conditions hereinafter set forth;

NOW, THEREFORE

in consideration of the mutual undertakings hereinafter set forth, the parties hereto agree as follows:

1. The licensor hereby grants to the licensee an exclusive license, together with the right to grant sublicenses, to make, use and sell in and throughout States of Maryland, Delaware, Pennsylvania, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, Maine, all the territory of the State of Virginia North of a line extending from Williamsburg to Richmond to Covington, all the territory in the State of West Virginia North of a line extending from Marlington to Charleston to Huntington, and the District of Columbia, organic compost embodying improvements covered by the aforesaid letters patent, under and for the full life of the said patent and for the life of any improvements of said patent hereinafter granted, unless this agreement is sooner terminated under the provisions hereof.

2. The licensee hereby agrees to pay to licensor, during the life of this agreement, an annual minimum royalty of Seven Thousand, Five Hundred ($7,500.00) Dollars. In addition thereto, licensee agrees to pay to licensor a further annual royalty, at the rates specified in the following schedule, on licensee's gross sales price of all organic compost, embodying the improvements covered by said patent, manufactured and sold by licensee:

SCHEDULE

(a) 5% of the gross sales price on the first $100,000.00
(b) 6% of the gross sales price on the second $100,000.00
(c) 7% of the gross sales price on the third $100,000.00
(d) 10% of the gross sales price on each succeeding $100,000.00

Licensee's gross sales price shall mean the net price after deducting cash discounts allowed by licensee.

3. All royalty payments due under paragraph 2 of this agreement shall be payable semiannually on or before June 30 and December 31 of each year, commencing in the year 1961.

4. Licensee shall keep true and correct records from which all royalties payable under this agreement, and the dates of accrual thereof, may readily be determined, which said records shall be available for inspection by licensor or his accredited representatives at all reasonable times.

5. The licensee shall have the right to bring and maintain suit under the said patent against infringers thereof in its own name and/or the name of the licensor, and to make settlement with infringers; provided that the costs and expenses of any such suit shall be borne and paid licensee and it is further agreed that any and all sums which may be received in any such suit and/or settlement, whether by judgment or otherwise, shall be the sole and exclusive property of the licensee and licensor shall have no interest therein.

6. The licensee hereby covenants and agrees that during the life of this agreement it will diligently manufacture and sell organic compost, embodying the improvements covered by said patent, and will exert its best efforts to create a demand therefor.

7. The licensor hereby stipulates that he has good title to the aforesaid patent and the right to grant the exclusive license hereby granted to the licensee.

8. In the event either party shall at any time neglect, fail or refuse to keep or perform any of the conditions or covenants to be kept or performed by it under the provisions hereof, then the other party may, at its election, serve on the party in default written notice of intention to terminate this agreement and specifying the default. If the party in default shall not cure the default so specified within 30 days thereafter, then the other party may terminate this agreement forthwith by serving on the party in default written notice of its election so to do; provided, however, that termination of this agreement shall not relieve licensee from paying the full royalties herein provided which have accrued prior to the effective date of such termination. Failure by either party to terminate for any breach of the other party shall not be construed as a waiver of the right so to do for any continuation of said breach or for any subsequent breach of the same or other provisions of this agreement.

9. Any notice hereunder must be given in writing and may be given by registered letter. Any such notice shall be deemed to have been given when such registered letter, properly addressed, is mailed. If any such notice is given otherwise than by registered letter, it shall be decided to have been given when delivered. If any such notice is to be given to licensor it shall be addressed to licensor at his office, at Germantown, Wisconsin; if given to licensee it shall be addressed to licensee at its address hereinbefore stated. Either party hereto may at any time designate any other address in place of those given above.

10. In the event licensee becomes insolvent, or commits any act of bankruptcy, or any order for compulsory liquidation of licensee is made by any competent court, all rights granted to it and all obligations owing it hereunder shall, at the election of the licensor, immediately terminate, without prejudice to any right, action or remedy that licensor may have for recovery of any royalties due it hereunder prior to the effective date of such termination.

11. This agreement shall be binding upon the parties hereto and shall enure to the benefit of the successors and assigns of licensee and the heirs, executors, administrators and assigns of licensor, except that licensor's personal obligations hereunder shall not be assignable.

The deficiencies in issue in this case result entirely from the royalty payments received by decedent pursuant to that license agreement with Pennsylvania. During the years in issue, Pennsylvania and Wisconsin were the only firms producing the patented product.

In 1968, decedent entered into an agreement entitled "Exclusive License Agreement" with Texas. That agreement was similar to decedent's agreement with Pennsylvania, but, whereas the Pennsylvania license was limited to certain eastern States, the Texas license was limited to the States of Texas, Oklahoma, New Mexico, Arizona, Louisiana, Arkansas, Kansas, Colorado, and Wyoming. Decedent's initial receipt of royalties under the Texas agreement occurred after the taxable years in issue.

At all times pertinent to this case, Wisconsin has had authority, pursuant to an arrangement with decedent and comparable to that granted to Pennsylvania and Texas, to make, use, and sell organic compost embodying decedent's patented process in certain Midwestern States. The rights of Wisconsin have been subject to the terms of the agreements with Pennsylvania and Texas.

In December 1969, decedent entered into a second "Exclusive License Agreement" with Pennsylvania. Under this agreement, Pennsylvania's territorial license was expanded to include the entire United States. Also in December 1969, Pennsylvania entered into sublicensing agreements with Wisconsin and Texas.

Just prior to May 3, 1971, 4,000 shares of Pennsylvania were outstanding, and stockholders' equity in Pennsylvania totaled $600,000. On that date, as part of a transaction qualifying under section 351, decedent executed an "Assignment of Patent," whereby he assigned to Pennsylvania his entire interest in Letters Patent No. 2750269. In exchange, decedent received 8,146 newly issued shares of Pennsylvania stock with a book value of $150 per share, a total of $1,221,900. Pennsylvania placed a book value of $1,221,967 on the patent. Pertinent portions of that agreement provide:

ASSIGNMENT OF PATENT

Assignment made as of this 3rd day of May 1971, by GEORGE T. KLEIN, Glendale, Wisconsin, Assignor, to ORGANIC COMPOST CORPORATION of Pennsylvania, Assignee.

WHEREAS, Letters Patent of the United States for the processing of organic matter have been issued to Assignor, which Letters Patent are numbered A2750269 and dated June 12, 1956, and

WHEREAS, pursuant to contracts dated February 13, 1960, and May 9, 1968, Assignor granted to Assignee and Organic Compost Corporation of Texas, respectively, exclusive licenses to manufacture, use and sell organic compost under said patent in certain specified territories, and Assignor is the sole owner of such patent and all rights thereunder except for said two exclusive licenses.

WHEREAS, Assignee desires to acquire the entire interest of the Assignor in said patent and improvements,

NOW, THEREFORE, for valuable consideration, receipt whereof is hereby acknowledged, the Assignor hereby assigns to the Assignee, its successors and assigns, all of his interest in such process and in the Letters Patent issued therefor, such interest to be held to the full end of the term for which such Letters Patent or

any reissues, renewals or extensions thereof are or may be granted. Assignor covenants that no royalties have accrued from the period commencing July 1, 1970, to the date of this assignment, under the exclusive license agreements aforementioned.

The Assignor agrees to execute any instruments and to perform any acts which may be necessary to carry this assignment into full effect.

The parties acknowledge that the sole consideration for the assignment of this patent is the issuance of certain capital stock of the Assignee to the Assignor, no other consideration being due and payable.

Also on May 3, 1971, articles of merger were entered into by Wisconsin, Pennsylvania, and Texas, pursuant to which Texas and Pennsylvania were merged into Wisconsin on June 30, 1971.

The organic compost embodying decedent's patented process and produced by Wisconsin, Texas, and Pennsylvania is marketed by several national store chains and is usable throughout the United States without geographic limitation.

The Commissioner determined that royalties received pursuant to the 1960 agreement with Pennsylvania were taxable as ordinary income rather than long-term capital gains. The Commissioner relies on section 1.1235–2(b)(1)(i), Income Tax Regs., which states that "a grant of rights to a patent—(i) Which is limited geographically within the country of issuance" is not a grant of "all substantial rights" so as to qualify the proceeds for capital gains treatment under section 1235.

In *Vincent B. Rodgers*, 51 T.C. 927 (1969), acquiesced in result only 1973–1 C.B. 2, we examined the legislative history of section 1235 and numerous cases involving transfers of rights limited to certain geographical areas and concluded that regulations section 1.1235–2(b)(1)(i) was invalid. We see no reason to review that legislative history and those cases to which we gave "most thoughtful consideration" in *Rodgers* at 930.

In *Thomas L. Fawick*, 52 T.C. 104 (1969), revd. 436 F. 2d 655 (C.A. 6, 1971), we relied on *Rodgers* and its approval of *William S. Rouverol*, 42 T.C. 186 (1964), and held invalid regulations section 1.1235–2(b)(1)(iii), which excludes from the benefits of section 1235 a grant of rights "in fields of use within trades or industries, which are less than all the rights covered by the patent, which exist and have value at the time of the grant." We do not believe that the reversal of *Fawick* by the Sixth Circuit affects our holding in *Rodgers*, for *Rodgers* involved geographical limitations and regulations section 1.1235–2(b)(1)(i) rather than field of use limitations and regulations section 1.1235–2(b)(1)(iii). See *Donald C. MacDonald*, 55 T.C. 840, 858 fn. 2 (1971).

The Commissioner argues that, even if we do not follow his regulations, we should hold that the 1960 grant to Pennsylvania was not intended to transfer all substantial rights to the patent. He argues that

decedent's "Assignment of Patent" to Pennsylvania in 1971 indicated that, despite the transactions in 1960, 1968, and 1969, decedent had retained rights worth more than $1,200,000. In effect, the Commissioner asks us to use the 1971 transaction to hold that, despite the language of the 1960 agreement,[2] decedent did not intend to transfer all substantial rights to the patent.

Since the 1960 agreement was limited geographically, decedent could enter into other licensing arrangements for other geographical areas without casting doubt on the intent of the parties to the 1960 agreement. Decedent entered into such an arrangement with Texas in 1968. Decedent did not purport to grant rights encompassing the entire United States until he entered into the 1969 agreement, which is not in issue. Any questions raised by the 1971 transaction would seem to concern that 1969 transaction rather than the 1960 transaction.

The fully stipulated record provides little information concerning the 1971 agreement. The "Assignment of Patent" states that decedent was "the sole owner of such patent and all rights thereunder except for * * * two exclusive licenses" granted in 1960 and 1968 to Pennsylvania and Texas. Because the 1971 assignment is referred to as a part of a section 351 transaction, we hesitate to conclude that decedent received $1,200,000 for his rights. In the 1971 agreement, decedent apparently relinquished any right to royalties, the value of which may be included in the $1,200,000. We are in no position to determine the relationship between the 1960, 1968, 1969, and 1971 agreements, the value of the consideration in 1971, or the value of rights other than royalty rights relinquished in 1971.

The Commissioner relies heavily on two cases, *Redler Conveyor Co.* v. *Commissioner*, 303 F. 2d 567 (C.A. 1, 1962), affirming a Memorandum Opinion of the Court, and *Allied Chemical Corporation* v. *United States*, 370 F. 2d 697 (C.A. 2, 1967), neither of which we consider controlling. In *Redler*, licensing agreements were explicitly canceled and reconstructed. The court said (303 F. 2d at 569), "If the [earlier] agreements were actually assignments there would be no call, indeed no basis, for this roundabout maneuver, for * * * [the assignee] already was the owner of the patents by assignment." Because we do not believe that the 1960 agreement was in fact affected by the 1971 transaction, the reasoning in *Redler* does not control our decision.[3]

---

[2] The Commissioner does not argue that the 1960 agreement contains language by which decedent reserved any substantial rights in the patent other than that language expressing the geographical limitations.

[3] We also note that in *Redler,* in the paragraph following the statement quoted above, the court said (303 F. 2d at 569), "More importantly, however, and indeed basically, * * * [the earlier] agreements do not purport to transfer either entire or undivided interests in the patents but instead only segregated rights to some but not all of the uses of the patents."

In *Allied Chemical*, the licensing agreement contained specific reservations, including the right to grant a nonexclusive license in the same field of use to a specified party and the right to compel the original licensee to sublicense anyone designated by the licensor. Having examined these and other reservations and having determined that they represented substantial rights, the court said (370 F. 2d at 700) that the licensor's plans to sell the patent to the licensee 3 years after the execution of the license indicated "that the parties did not intend the * * * license to be a sale, and that they believed that valuable and desirable rights of control had been withheld from * * * [the licensee] in that license." The court's reasoning is not applicable to decedent's transactions, for, unlike decedent's 1960 agreement with Pennsylvania, the *Allied Chemical* license contained explicit reservations which were in fact capable of disposition and which were proved valuable by later plans for a sale. We do not find similar reservations in the 1960 agreement, and we cannot conclude that the 1971 transaction involved the disposition of any intended reservations.

Accordingly, we conclude that the 1960 agreement was a grant of all substantial rights to sublicense, make, use, and sell the patent in a limited geographical area. The proceeds of such a grant qualify for capital gains treatment under section 1235.

*Decision will be entered for the petitioners.*

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.