DAVID R. BLAKE AND BETTY H. BLAKE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8235–74.   Filed October 6, 1976.

David R. Blake, pro se.
*Thomas R. Ascher,* for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies of $1,447.20 and $26,177.38 in the petitioners' Federal

income taxes for 1969 and 1970, respectively. The issues now presented for decision are:

(1) Whether amounts received with respect to certain patent licensing agreements are taxable as long-term capital gain under section 1235[1] or as ordinary income;

(2) Whether a portion of damages received in 1970 in settlement of a patent infringement suit should have been accrued as income in 1968;

(3) Whether the surrender in 1969 of the right to receive certain royalties gave rise to a deduction or addition to cost in that year.

FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners, husband and wife, resided in Detroit, Mich., at the time their petition was filed. They filed joint Federal income tax returns, amended joint returns, Federal partnership returns of income, and amended partnership returns for the years 1969 and 1970. At all material times, petitioners and their partnership have reported their income on the accrual basis. The events in question relate to the activities of David R. Blake, who will hereinafter be referred to as petitioner.

On July 24, 1948, petitioner applied for a United States patent on a leveling device (hereinafter referred to as a glide) for tables and chairs. A patent was issued with respect to this application on March 22, 1955. On June 24, 1954, petitioner entered into a "license agreement" with the American Seating Co. (hereinafter American or American Seating). Under that license, American was entitled to make, have made, use, and sell glides during the life of the patents. The license was limited to the public seating field, i.e., "furniture and equipment for schools, churches, chapels, courtrooms, hospitals, theaters, auditoriums, and vehicles used in transportation" but excluding "furniture designed primarily for

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years involved.

restaurant and cafeteria use."[2] It provided for a royalty of eight-tenths of 1 cent (adjusted annually to reflect fluctuations in the consumer price index) on each glide sold by American. American agreed, among other things, not to compete with petitioner in the sale of glides per se (not incorporated in manufactured articles) outside the public seating field. The license could be made nonexclusive or canceled by petitioner if minimum royalties were not paid. It could also be canceled by either party on the other's default. In the event the patents were infringed by a competitor of American, petitioner undertook to take action against the infringer at his own expense. If he did not do so, American could take action in his name "and for the account of the parties as their interests may appear." American was authorized to withhold royalties during such proceedings and to apply them to defray the cost of a successful action. Petitioner had no liability for costs in excess of royalties.

Effective in November 1954 petitioner granted a 10-year license under the same patent to Ever-Level Glides, Inc. (hereinafter Ever-Level). Under their agreement, Ever-Level was to pay royalties of 7 percent of the net selling price of glides it sold. However, the royalty was limited to 5 percent until Mason & Parker Manufacturing Co., an alleged infringer, ceased (voluntarily or through legal action by petitioner) to manufacture or sell devices similar to the glides. The additional 2-percent royalty on sales made in the meantime was to be paid once the stated condition was satisfied. Petitioner did not commence any action against Mason & Parker under this agreement and never received the additional 2-percent royalty.

On April 6, 1960, petitioner and Ever-Level executed a "patent royalty agreement" which superseded the 1954 license. The 1960 agreement gave Ever-Level an exclusive license to make, have made, use, and sell glides throughout the United States and Canada for the life of the patents, subject to the American Seating license. Royalties were set at 5 percent of the net selling price of glides sold by Ever-Level.

_____

[2] Although the license could be construed to grant American a nonexclusive license in the restaurant field, both parties herein have treated the "public seating" limitation as applying to the entire license rather than only to its exclusive feature.

Should annual royalties with respect to sales in fields outside the "restaurant trade" not reach a specified minimum, the license would become nonexclusive with respect to those fields. The restaurant trade was defined as sales "for use in establishments offering food and/or drink to the public." There was no minimum royalty on sales in the restaurant field. Ever-Level never paid the minimum royalty on non-restaurant sales, and its license became nonexclusive as to such sales in 1963.

The 1960 license provisions regarding suits against alleged infringers were similar to those contained in the American Seating license. In addition, petitioner was obligated to defend infringement suits brought against Ever-Level at his own expense. Any net profit resulting from a suit by Ever-Level against an infringer was to be divided equally between it and petitioner.

Petitioner again agreed that he would "commence and vigorously and in good faith prosecute" an infringement action against Mason & Parker. If that action was unsuccessful, royalties would be reduced by half and, if unfavorable on the merits, Ever-Level had the right to cancel. If petitioner did not commence such an action promptly, Ever-Level could pay royalties into escrow pending the outcome of a suit. In the event of a successful action, petitioner would be entitled to the escrowed royalties plus one-half of the royalties which had previously been withheld under the 1954 agreement.

Ever-Level could cancel the agreement on 60 days' notice, and petitioner could cancel in the event of default. Both parties' rights were subject to a binding arbitration provision. The agreement would terminate on bankruptcy or similar event affecting Ever-Level. It was binding on both parties and their successors and could be assigned by either with the consent of the other. If petitioner desired to sell his patents, Ever-Level had a right of first refusal.

Petitioner thereafter attempted unsuccessfully to find a business willing to purchase rights under his patent outside the fields covered by the American Seating and Ever-Level licenses. He was told by those he contacted that it would not be commercially worthwhile to manufacture and sell glides in a market that excluded the public seating and restaurant fields.

Following acrimonious dispute between them, petitioner and Ever-Level canceled all previous agreements on May 1, 1969, and executed a settlement agreement. This agreement granted Ever-Level a royalty-free nonexclusive license limited to the restaurant field. Petitioner agreed to pay certain legal fees, and a promissory note issued by petitioner to an officer of Ever-Level was canceled. Ever-Level assigned to petitioner all rights to recover damages for infringement of petitioner's patents.

An infringement action by petitioner against Mason & Parker was begun in 1968 and successfully concluded in 1969. As an inducement for Ever-Level to enter into the May 1, 1969, settlement agreement, petitioner released any claim for the additional 2-percent royalty provided in the 1954 agreement. Ever-Level did not reduce, withhold, or pay into escrow any royalties under the 1960 agreement.

Petitioner and Ever-Level sued Bassick Co. and Stewart-Warner Corp. (hereinafter jointly referred to as Stewart-Warner)[3] for infringement of the glide patents. On February 23, 1967, the United States District Court for the Northern District of Illinois found the patents infringed. This decision was affirmed by the United States Court of Appeals for the Seventh Circuit on February 28, 1968, and petition for certiorari was denied on October 14, 1968. In December 1968, Stewart-Warner determined that it would have to pay petitioner damages of $43,304 ($36,783 in royalties and $6,521 in interest) and accrued that amount as a liability on its books. Stewart-Warner's motions to vacate the judgment and for rehearing en banc in the Seventh Circuit were denied on July 8 and September 9, 1969, respectively, and a further petition for certiorari was denied on January 12, 1970. In February 1970 a special master, appointed to determine damages, issued a proposed report. The report stated that the master had reviewed 2300 pages of testimony and depositions and over 200 exhibits. The master found that Stewart-Warner had sold 3,716,470 infringing glides, of which 3,065,856 were in the field covered by Ever-Level's exclusive license. He found that there was no "established royalty" with respect to the glides but that a "reasonable royalty" would be 7 percent

---

[3] Bassick Co. was later merged into Stewart-Warner.

of sales. On that basis, he found that petitioner was entitled to damages of $51,496.76, without interest prior to the filing of the report. He also found Ever-Level was entitled to damages of $131,893 for lost profits. Shortly thereafter, the case was settled by Stewart-Warner's payment of $171,694.88 to petitioner, to whom Ever-Level's claim had been assigned in 1969.

During 1969 petitioner also received, under settlement agreements, infringement damages of $5,527.90 from Robert E. Miller & Co., Inc., and $5,000 from United Industrial Syndicate, Inc.

### ULTIMATE FINDINGS OF FACT

Upon the grant of the exclusive license to Ever-Level, all substantial rights to petitioner's glide patent had been transferred.

The amount which petitioner was entitled to receive as infringement damages from Stewart-Warner could not be determined with reasonable accuracy prior to 1970.

### OPINION

### 1. *Section 1235*

The first question we must decide is whether section 1235 entitles petitioner to long-term capital gain treatment of amounts received with respect to his glide patent.[4] Petitioner granted two licenses, one exclusive in the public seating field (the American license) and one exclusive in the restaurant field (the Ever-Level license). He contends that the two licensed fields together covered all significant uses for his invention so that he has made a transfer of all substantial rights therein.

Section 1235 provides for long-term capital gain treatment with respect to "A transfer * * * of property consisting of all substantial rights to a patent * * * by any holder."[5] It applies to an exclusive license to make, use, and sell a patented item in all practical fields. See *Fawick v. Commissioner*, 436 F.2d

---

[4] Petitioner does not contend that he is entitled to capital gain treatment on any other theory if we find that the requirements of sec. 1235 are not met. See *Myron C. Poole*, 46 T.C. 392 (1966). But see Rev. Rul. 69–482, 1969–2 C.B. 164.

[5] It is conceded that petitioner was a "holder."

655 (6th Cir. 1971), revg. on other grounds 52 T.C. 104 (1969). Section 1.1235–2(b)(1), Income Tax Regs., among other things, defines "all substantial rights to a patent" to mean "all rights * * * which are of value at the time the rights to the patent * * * are transferred." Thus, petitioner will fail if we determine that, during the taxable years in question, he retained rights which were "of value." Accordingly, it is to this factual question that we initially turn our attention.

At least theoretically, it would appear that petitioner retained some rights after the grant of exclusive licenses to American Seating and Ever-Level since those licenses involved only two fields of use.[6] However, respondent's regulations are addressed to the question of the "value" of those rights and, in that context, the courts have sought, in situations involving field-of-use licenses, to determine whether there was an "established value" (*United States v. Carruthers,* 219 F.2d 21, 25 (9th Cir. 1955); *Flanders v. United States,* 172 F.Supp. 935, 950 (N.D. Cal. 1959)), "potential value" (*Mros v. Commissioner,* 493 F.2d 813, 816 (9th Cir. 1974), revg. T.C. Memo. 1971–123), "known value" *(Fawick v. Commissioner, supra)*, "substantial value" (*Gruber v. United States,* 158 F.Supp. 510, 514 (D. Ore. 1958)), "ascertainable fair market value" (*Puschelberg v. United States,* 330 F.2d 56, 61 (6th Cir. 1964)), or "value" (*Bannister v. United States,* 262 F.2d 175, 178 (5th Cir. 1958)). Cf. *E. I. du Pont de Nemours & Co. v. United States,* 432 F.2d 1052, 1055 (3d Cir. 1970), and *Bell Intercontinental Corp. v. United States,* 381 F.2d 1004, 1015 (Ct. Cl. 1967), adopting the standards of "substantial value" and "little tangible value," respectively, in determining whether a transfer of patent rights by a nonholder under

---

[6] The license to Ever-Level in respect of the restaurant field became nonexclusive on May 1, 1969. See p. 10 *supra.* But the issue before us involves royalties and damages for infringement arising during the prior periods of exclusivity. In this connection, we note that a substantial portion of the damages for infringement were actually damages to which Ever-Level was entitled from Stewart-Warner. See p. 11 *supra.* Respondent has made no independent argument as to noneligibility of these amounts under sec. 1235 and the regulations thereunder on the ground that Ever-Level would not be entitled to claim the benefit of that section and that therefore petitioner should also not be so entitled. As a consequence, we do not address ourselves to the potentially knotty problems which may be involved in this aspect of the case.

section 1235 qualified for capital gain treatment under sections 1221 and 1222.

We see no reason to engage in a semantic exercise to determine which adjective should be affixed to the word "value" in order to determine whether the aforementioned provision of respondent's regulations has been met. The question to be resolved is one of fact and we are satisfied that petitioner has carried his burden of proof. We base our conclusion on our evaluation of the record as a whole, including the fact that the report of the special master in the infringement action clearly indicates that the only two markets "of any consequence" were the restaurant field and school furniture (public seating).[7] In so concluding, we should point out, however, that petitioner did retain rights of value during the period after the grant of the exclusive license to American Seating for the field of public seating but before the grant of the exclusive license to Ever-Level in the restaurant field; the latter license is clear proof of the existence of such value. That period ended well before the taxable years involved herein and therefore we need not concern ourselves with this aspect of the case, except to the extent that the issue of the applicability of section 1235 to field-of-use exclusive licenses is involved—an issue to which we now turn our attention.

Section 1.1235–2(b)(1) of respondent's regulations, in effect during the taxable years involved herein, specifically provides that "The term 'all substantial rights to a patent' does not include a grant of rights to a patent * * * Which grants rights to the grantee, in fields of use within trades or industries, which are less than all the rights covered by the patent, which exist and have value at the time of the grant." In *William S. Rouverol,* 42 T.C. 186 (1964), we held section 1235 applicable to an exclusive license which contained an industry field-of-use limitation, and in *Thomas L. Fawick,* 52 T.C. 104 (1969),

---

[7] Respondent, at the trial and on brief, objected to the introduction of this report and other documentary evidence on the ground of relevancy. The Court has given careful consideration to respondent's objections and they are hereby overruled. We also note that, in the context of this case, it might have been helpful if the respondent had elected to cross-examine petitioner or offer some countervailing proof that the retained rights had "value," although obviously he was not required to do either. *Potts, Davis & Co. v. Commissioner,* 431 F.2d 1222, 1225 (9th Cir. 1970); *Fleischer v. Commissioner,* 403 F.2d 403, 406 (2d Cir. 1968); *John R. Thomas,* 12 T.C.M. 181 (1953).

we held the above-quoted regulation (promulgated after *Rouverol* was decided) invalid to the extent it was inconsistent with congressional intent as determined by *Rouverol.* However, our decision in *Fawick* was reversed by the Sixth Circuit Court of Appeals. *Fawick v. Commissioner, supra,* specifically rejected our analysis of the legislative history of section 1235 and held the regulation valid.[8] See also *Mros v. Commissioner, supra; First National Trust & Savings Bank of San Diego v. United States,* 200 F.Supp. 274 (S.D. Cal. 1961).

In *Fawick,* the issue was whether royalties under an exclusive license containing an industry field-of-use limitation qualified for capital gain treatment under section 1235 where the holder retained valuable rights to other uses at the time of the transaction; at a later date, but before the taxable years involved therein, the taxpayer had assigned his rights in the patent (excluding the rights which were subject to the aforementioned license and certain other rights which he reserved) to a corporation solely in exchange for stock. The Sixth Circuit Court of Appeals resolved the issue in respect of the field-of-use exclusive license against the taxpayer. The *Fawick* decision has since been followed by another Circuit Court of Appeals. See *Mros v. Commissioner, supra.* We find it unnecessary in this case to decide whether we will abandon or continue to adhere to the position we took in *Fawick* and *Mros.* Since an appeal herein will be to the Sixth Circuit Court of Appeals, *Jack E. Golsen,* 54 T.C. 742 (1970), affd. on the substantive issue 445 F.2d 985 (10th Cir. 1971), requires us to follow the decision of that circuit in *Fawick.* Accordingly, we hold that petitioner is not entitled to the benefits of section 1235 in respect of the royalties from American Seating during the taxable years in question.

A different problem arises with respect to the Ever-Level royalties and the infringement damages awarded to Ever-Level and assigned to petitioner (see n. 6 *supra*). We have found that, after the grant of the exclusive license to Ever-Level, the petitioner retained no rights of value. In substance,

---

[8] Cf. *Estate of Klein v. Commissioner,* 507 F.2d 617 (7th Cir. 1974), revg. 61 T.C. 332 (1973), in which this Court had followed our decision in *Vincent B. Rodgers,* 51 T.C. 927 (1969), holding invalid the provision of respondent's regulations denying long-term capital gain treatment under sec. 1235 to exclusive geographic field-of-use licenses.

therefore, that license represented a transfer of all of the rights of petitioner other than the rights under the American Seating license. Respondent contends that section 1235 still does not apply to the Ever-Level license on the ground that that section applies only where there is a *single transferee* of all substantial rights under a patent. In so contending, respondent points to the second prong of the two-pronged test established by the Sixth Circuit Court of Appeals in *Fawick v. Commissioner,* 436 F.2d at 662:

> If the taxpayer can show that he has no substantial rights in the patent after the transfer, as a second inquiry we must look at what he actually relinquished to the transferee. It is our opinion that the phrase "all substantial rights to a patent" is a reference to the monopoly right for which the patent stands. The monopoly right granted by the patent is the right to exclude others from making, using, or selling the invention. This necessarily encompasses the right to exclude others from any particular industrial field in which those others might choose to use the invention. This is the right that must be sold to the transferee, and the transfer must cover all practical fields-of-use for the invention. [Fn. ref. omitted.]

See also *Mros v. Commissioner,* 493 F.2d at 816; *First National Trust & Savings Bank of San Diego v. United States,* 200 F.Supp. at 282.

Since the only issue before the Sixth Circuit Court of Appeals was the initial field-of-use exclusive license, it is clear that the issue in respect of the second license (Ever-Level) involved herein was not specifically considered in *Fawick* and we therefore do not consider that *Jack E. Golsen, supra,* binds us to follow the Sixth Circuit's analysis in this regard. In fact, we disagree. We see no reason why petitioner should not be entitled to the benefits of section 1235 in respect of the Ever-Level license which we have found constituted a transfer of all rights which were of value to him at the time of the transfer. We recognize that section 1235 refers to "A transfer * * * of property consisting of all substantial rights to a patent" (emphasis added) and that this language literally supports respondent's position. Furthermore, we recognize that the language of respondent's regulation, which speaks of "all rights (whether or not then held by the grantor) which are of value at the time the rights to the patent * * * are transferred," is also capable of such an interpretation, although in our opinion this is not necessarily the case. See *Bell Intercontinental Corp. v. United States,* 381 F.2d at 1015

n.5. On the other hand, both this Court and the Court of Claims have previously indicated substantial reservations about respondent's position. See *Bell Intercontinental Corp. v. United States,* 381 F.2d at 1013–1015; *Donald C. MacDonald,* 55 T.C. 840, 859 (1971). Moreover, the courts have accorded a liberal interpretation to section 1235. See *Young v. Commissioner,* 269 F.2d 89, 93 (2d Cir. 1959), affg. 29 T.C. 850 (1958); *William S. Rouverol,* 42 T.C. at 191. Finally, it seems clear to us that a nonholder, who could not claim the benefits of section 1235, could nevertheless report long-term capital gain under sections 1221 and 1222 on such a transfer, and, under these circumstances, we see no reason why section 1235 should be more strictly applied. *Bell Intercontinental Corp. v. United States, supra; Donald C. MacDonald, supra.* We hold that petitioner is entitled to long-term capital gain benefits under section 1235 in respect of the royalties and infringement damages attributable to the Ever-Level license.[9]

There are some loose ends. Respondent determined that the infringement damages from Robert E. Miller & Co., Inc., and United Industrial Syndicate, Inc., were ordinary income to petitioner. Since there is nothing in the record to indicate that the infringing sales can be attributed to the Ever-Level license, respondent's position must be sustained. See sec. 1.1235–1(c), Income Tax Regs. With respect to the damages arising out of Stewart-Warner's infringement, received by petitioner directly, we think at least a portion thereof cannot be attributed to sales in the restaurant field.[10] The special master found that Stewart-Warner sold 3,716,470 infringing glides, of which 3,065,856 (or 82.5 percent) were in that field.[11]

---

[9] See Morreale, "Patents, Know-How and Trademarks: A Tax Overview," 29 Tax Lawyer 553, 560–561 (1976). We do not agree with respondent that our analysis will produce practical problems based on fluctuations between capital gains and ordinary income in the characterization of amounts received pursuant to sequential licensing agreements. We accord capital gain treatment herein only to the license transferring "all substantial rights" then held by petitioner. Under the Courts of Appeals' decisions in *Fawick* and *Mros,* income from other prior field-of-use exclusive licenses will continue to be taxed as ordinary income, at least with respect to taxpayers in the Sixth and Ninth Circuits.

[10] Amounts received by virtue of the assignment of Ever-Level's claim to petitioner were entirely attributable to such sales.

[11] The special master's report is not clear as to the end-use composition of the remaining 17.5 percent of Ever-Level's sales, but it appears highly probable that those sales were for use in the public seating field. Since American Seating was not a party to the infringement suit, there was no need for the special master to make any

The gross amounts awarded by the special master were $51,496.76 to Blake and $131,893 to Ever-Level, or an aggregate of $183,389.76. The amount of the settlement determined to be ordinary income in the deficiency notice was $171,694.88. Consequently, we think that only 82.5 percent of 171,694.88/183,389.76 of $51,496.76 should be taxed as long-term capital gain under section 1235 and the balance of the $51,496.76 should be taxed as ordinary income.

## 2. *Infringement Damages*

Petitioner and Ever-Level sued Stewart-Warner and a predecessor corporation for infringement of the glide patents. In 1967, the District Court held that there had been an infringement, which holding was affirmed and certiorari denied in 1968. *Blake v. Bassick Co.*, 262 F.Supp. 910 (N.D. Ill. 1967), affd. 392 F.2d 879 (7th Cir. 1968), cert. denied 393 U.S. 828 (1968). Various motions and petitions for certiorari by Stewart-Warner were denied, the last in early 1970 (396 U.S. 1006). Also in 1970, the special master issued his report as to the amount of damages to be awarded and the parties agreed to settle the matter shortly thereafter. Stewart-Warner accrued an amount on its books in 1968 as damages payable to petitioner. Petitioner contends that, following the initial denial of certiorari in 1968, at least the amount so accrued was properly income to him under the accrual method of accounting. Petitioner's tax liability for 1968 is not before us.

There are two factual conditions precedent to accrual of an item of income. It must appear that all events fixing the right to receive income have occurred and that the amount of income can be determined with reasonable accuracy. *Ralph L. Brutsche,* 65 T.C. 1034, 1060 (1976); sec. 1.451–1(a), Income Tax Regs.

We see no need to dwell upon the question whether we should ignore, as petitioner would have us do, the various attempts by Stewart-Warner, after 1968, to reopen the issue of the validity of the patent upon which petitioner's *right* to recover depended. Even if we assume that such right became fixed upon the initial denial of certiorari in 1968, petitioner

---

findings in this regard. To the extent that such damages were attributable to infringing sales in the public-seating field, they would partake of the same taxable character to petitioner herein as the American Seating royalties.

cannot prevail. It is apparent from the special master's report that the basis for determining the amount of petitioner's recovery (and that of Ever-Level as well) was disputed and clearly not reasonably calculable until that report was issued in 1970.[12] Under these circumstances, any accrual prior to that year would not be proper. *First Bancredit Corp. v. Flexlume Corp.,* 10 F.Supp. 1015 (W.D.N.Y. 1934). Cf. *United States v. Safety Car Heating & Lighting Co.,* 297 U.S. 88 (1936); *Triplex Safety Glass Co. v. Latchum,* 44 F.Supp. 436 (D. Del. 1942), affd. per curiam 131 F.2d 1023 (3d Cir. 1942); *W. W. Sly Manufacturing Co.,* 24 B.T.A. 65 (1931). The cases relied upon by petitioner either are distinguishable or support respondent's position. In *Continental Tie & Lumber Co. v. United States,* 286 U.S. 290 (1932), the Supreme Court held that the amount could have been determined with reasonable accuracy during the taxable year in question. In *H. Liebes & Co. v. Commissioner,* 90 F.2d 932 (9th Cir. 1937), affg. 34 B.T.A. 677 (1936), the Court of Appeals merely held that the amount was not properly accruable in earlier years when the judgment fixing both the right and the amount was fixed but in the taxable year in question when the right of appeal expired or payment was received. In *Lark Sales Co. v. Commissioner,* 437 F.2d 1067 (7th Cir. 1970), affg. in part and revg. in part *Richard L. Medd,* T.C. Memo. 1968–244, the Court of Appeals applied the usual test and went on to hold that the right in question was subject to a bona fide dispute. In *Boston Elevated Railway Co.,* 16 T.C. 1084 (1951), affd. on other grounds 196 F.2d 923 (1st Cir. 1952), this Court held that accrual should be deferred where, although the right of receipt was fixed, the amount and the method of computation thereof were being contested. Finally, in *Lucas v. American Code Co.,* 280 U.S. 445 (1930), although the Supreme Court adverted to the fact that a part of the amount in question had been accrued on the corporate books, it held that this represented no more than what a prudent businessman would do with respect to a *potential* liability and did not justify accrual for tax purposes as long as liability was being contested and the amount of damages was unpredictable; the Court's analysis disposes of petitioner's contention to the

---

[12] The special master described his task as calculating the incalculable.

extent that it is based on the fact that Stewart-Warner entered an accrual in favor of petitioner on its books in 1968.

### 3. *Surrender of Royalty Rights*

In connection with the 1969 settlement agreement with Ever-Level, petitioner abandoned any claim for royalties under the 1954 license agreement which were unpaid due to his failure to bring suit against Mason & Parker Manufacturing Co. Petitioner alleges that such royalties—totaling $6,836.78—were properly accrued and reported on his tax returns while the 1954 agreement was in force[13] and that he is entitled to an offsetting deduction in 1969 to reflect surrender of his claim to them. Petitioner has wholly failed to establish any legal or factual basis for the asserted deduction.

Initially, we observe that petitioner's attempt to shift the burden of proof on this issue to respondent is unavailing. While the matter may have been raised orally before the Service during the administrative process, that fact has no more effect on the burden of proof than if it had been raised in his original return. Petitioner first formally raised his present contention in an amended partnership return filed after the notice of deficiency was issued and renewed it in his petition. There are no circumstances which would justify our disregarding the general rule placing the burden of proof on petitioner. Rule 142, Tax Court Rules of Practice and Procedure.

The record does not support the contention that the additional royalties in question were properly accruable at any time prior to 1969. Their payment was wholly contingent on success in infringement litigation against Mason & Parker, which success did not occur until that year. Thus, any deduction which might be allowable as a result of other events occurring in 1969 could do no more than offset an equivalent, currently accruable income item. Further, petitioner had already surrendered his right to half the amounts under consideration in the 1960 Ever-Level agreement. Finally, he has not proved that he suffered any loss by relinquishing the balance of his claim. Numerous elements of consideration

---

[13] Petitioner testified that he actually reported 50 percent of paid and unpaid royalties because of his belief that they were taxable as capital gains.

passed between petitioner and Ever-Level by virtue of the 1969 settlement, only one of which was the assignment to petitioner of Ever-Level's claim against Stewart-Warner. That claim had a value far in excess of the allegedly canceled royalties, as subsequent events demonstrated.

Petitioner's alternative position, that the amount forgiven should be treated as a cost of acquiring Ever-Level's claim and set off against the recovery received in 1970, must also be rejected. He has not shown any method by which the various items of consideration passing to Ever-Level in connection with the 1969 settlement could be allocated among the benefits he received. Those benefits included the cancellation of personal indebtedness and the termination of Ever-Level's exclusive license. It is impossible for us to determine what portion, if any, of the canceled royalties should be treated as a cost properly applied against the 1970 recovery. Cf. *Battle Creek Food Co. v. Commissioner*, 181 F.2d 537 (6th Cir. 1950), affg. 8 T.C.M. 207 (1949). We hold for respondent on this ground as well.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

QUEALY, *J.*, dissents.

HALL, *J.* concurring: Courts of Appeals in three circuits have rejected our nonliteral reading of the statutory term "all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights." *Estate of Klein v. Commissioner*, 507 F.2d 617 (7th Cir. 1974), cert. denied 421 U.S. 991 (1975), revg. 61 T.C. 332 (1973); *Mros v. Commissioner*, 493 F.2d 813 (9th Cir. 1974), revg. a Memorandum Opinion of this Court; *Fawick v. Commissioner*, 436 F.2d 655 (6th Cir. 1971), revg. 52 T.C. 104 (1969). Respondent's regulations rejecting our position have already been thrice upheld. It is not fair to respondent to continue to force him to litigate this issue. We should now confess error, the more so because none of our opinions on this issue have come to grips with the plain language of the statute. *William S. Rouverol*, 42 T.C. 186 (1964), simply failed to deal with the fact that the language of section 1235 imposed as a precondition for the statutory safe harbor a more stringent test: "all substantial

rights to the patent, or an undivided interest therein which includes a part of all such rights." Words could not be chosen more precisely to preclude the availability of section 1235 to the transfer of a non-undivided interest in a patent with the retention of substantial rights, but *Rouverol* did not focus on the statutory language at all. Nor did our cases following it. *Vincent B. Rodgers,* 51 T.C. 927 (1969); *Thomas L. Fawick,* 52 T.C. 104 (1969), revd. 436 F.2d 655 (6th Cir. 1971); *Estate of George T. Klein,* 61 T.C. 332 (1973), revd. 507 F.2d 617 (7th Cir. 1974), cert. denied 421 U.S. 991 (1975). We were in error and having now been so instructed by three Courts of Appeal, we should reverse our position and uphold respondent's regulations. Nor are respondent's regulations even particularly harsh. Under them, a patent holder who cannot meet the statutory test may still have recourse to capital gain treatment outside section 1235 if he can meet the holding period required and if he holds the patent as a capital asset. See sec. 1.1235–1(b), Income Tax Regs. But see *Myron C. Poole,* 46 T.C. 392 (1966).

A further reason for disagreement with the majority is its use of *Jack E. Golsen,* 54 T.C. 742 (1970), affd. on the substantive issue 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), to avoid stating our views on the issue. In *Golsen* we said (54 T.C. at 757):

Moreover, the practice we are adopting does not jeopardize the Federal interest in uniform application of the internal revenue laws which we emphasized in *Lawrence.* We shall remain able to foster uniformity by giving effect to our own views in cases appealable to courts whose views have not yet been expressed, and, even where the relevant Court of Appeals has already made its views known, by explaining why we agree or disagree with the precedent that we feel constrained to follow.

*Golsen* did not contemplate that we would abandon our position as a national court for tax matters within our jurisdiction. Our opinions are not written merely to decide the case for the litigants before us, but are for the guidance of the public and respondent (within and without the circuits to which appeal lies). Under our former rule in *Arthur L. Lawrence,* 27 T.C. 713 (1957), revd. per curiam on the substantive issue 258 F.2d 562 (9th Cir. 1958), we necessarily gave the public the benefit of our views, at the occasional cost of necessitating a superfluous appeal. *Golsen* was intended,

quite properly, to eliminate the superfluous appeal; we shirk our duty if we seize upon it as an occasion also to omit the statement of our views for the guidance of taxpayers in circuits other than that to which appeal lies. Whether the Court reaffirms or recants its prior position, the public should be informed.

WILBUR, *J.*, concurring in part and dissenting in part: We again face the issue of whether a use-restricted license represents "all substantial rights evidenced by a patent" under section 1235(a)[1] when the holder has retained valuable rights.

The regulations state that geographic and use-restricted licenses do not convey "all substantial rights." Sections 1.1235–2(b)(1)(i) and (iii), and 1.1235–2(c), Income Tax Regs. We have held that these provisions of the regulations are unreasonable and plainly inconsistent with the statute and, on three different occasions, have been reversed by three different Circuit Courts of Appeals. *Estate of Klein v. Commissioner,* 507 F.2d 617 (7th Cir. 1974), revg. 61 T.C. 332 (1973), cert. denied 421 U.S. 991 (1975);[2] *Mros v. Commissioner,* 493 F.2d 813 (9th Cir. 1974), revg. a Memorandum Opinion of this Court; *Fawick v. Commissioner,* 436 F.2d 655 (6th Cir. 1971), revg. 52 T.C. 104 (1969).

The formidable and well-reasoned authority arrayed against our position requires a thorough reanalysis by the Court. Unless we can state a clearly articulated and compelling rationale for our position, a tenacious adherence to our prior views will serve only to promote further uncertainty.

In fact, a compelling rationale for the Court's position cannot be stated, since a review of the legislative history

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified.

[2] In reversing our decision in *Klein* (a case involving a geographically restricted patent license), the Seventh Circuit made it clear that geographic and use-restricted patents, for purposes of the issue before us, present essentially the same question by citing the Courts of Appeals opinions in *Fawick v. Commissioner,* 436 F.2d 655 (6th Cir. 1971), revg. 52 T.C. 104 (1969), and *Mros v. Commissioner,* 493 F.2d 813 (9th Cir. 1974), revg. a Memorandum Opinion of this Court, for support. *Estate of Klein v. Commissioner,* 507 F.2d 617, 622 (7th Cir. 1974), revg. 61 T.C. 332 (1973), cert. denied 421 U.S. 991 (1975).

underlying section 1235 makes it quite clear that we are in error. Section 1235 was added to the Code in 1954. The House version provided capital gains treatment for a sale or exchange of a patent, an application for a patent, or an undivided interest therein, provided that the "seller retains no interest whatsoever" in the patent.[3]

The Senate Finance Committee rewrote section 1235 in its present form. The term "no interest whatsoever" in the House bill was deleted in favor of the term "all substantial rights." The change appears to have been intended to simply permit the seller to retain a security interest in the patent, such as a reversion should the purchaser fail to make the payments.[4] That the term clearly did not encompass geographic or use-restricted transfers can be seen by focusing on the term "undivided interest" (in a patent or all substantial rights to a patent) which appears in both the House and Senate bill.

The Senate Finance Committee explained:

By "undivided interest" a part of each property right represented by the patent (constituting a *fractional share of the whole patent*) is meant (and not, for example, a lesser interest such as a right to income, or a license limited geographically, or a license which *conveys some, but not all, of the*

---

[3] As originally approved by the House, sec. 1235(a) appeared as follows:

(a) GENERAL.—Gain from the sale or exchange of property consisting of a patent or application therefor, or an undivided interest therein which includes a part of all rights in such patent or application, by any person whose efforts created such property shall be deemed gain from the sale or exchange of a capital asset if and only if—

(1) the seller retains no interest whatsoever in the patent, application, or undivided interest therein so transferred, except to the extent that the purchase price may be related to the productivity, use, or disposition of the property transferred within a period of 5 years from the date of such sale or exchange; and

(2) the entire proceeds of such sale or exchange are received by the seller within a period of 5 years from the date of such sale or exchange. For purposes of this paragraph, any proceeds due and payable within such period which are received thereafter solely by reason of failure of the purchaser (or any successor in interest of such purchaser) to fulfill a contractual obligation shall be deemed to have been received within such period. [H.R. 8300, 83d Cong., 2d Sess. 259 (1954)].

[4] Several persons testified before the Senate Finance Committee that the "no interest whatsoever" language of the House bill would prevent the retention of such an interest. Hearings on H.R. 8300 Before the Senate Committee on Finance, 83d Cong., 2d Sess. 339 (Statement of Tarleau, Chairman of the A.B.A. Section of Taxation), 492 (Statement submitted on behalf of the A.B.A. Section of Taxation), 1235–1236 (Statement of William B. Barnes, a professional mechanical engineer), 1866 (Statement by Francis W. Davis, a consulting engineer) (1954).

*claims* or *uses* covered by the patent). \* \* \* [S. Rept. No. 1622, 83d Cong., 2d Sess. 439 (1954).[5] Emphasis added.]

The Senate Finance Committee thus specifically stated that an "undivided interest" in all substantial rights did not encompass a use-restricted license. If a fractional interest in "all substantial rights" of a patent excludes a use-restricted transfer, then it seems clear that when the transfer is of the *entire* interest in all substantial rights, a use-restricted transfer is similarly excluded. First, Congress in using the term "all substantial rights" in the first sentence of section 1235 clearly used the word with the same meaning, and this meaning is clearly explained in the Senate committee report. Secondly, it would be odd (and again inconsistent) to exclude a use-restricted transfer from a transfer of a portion of all substantial rights if the broader concept of the entire interest in all substantial rights already permitted such a division.[6]

Petitioner's agreement with Ever-Level raises the second issue of whether, once a use-restricted license is given, the holder of the reserved rights may sell them and receive capital gains treatment under section 1235. Clearly he cannot qualify under section 1.1235–2(b)(1), Income Tax Regs., which defines "all substantial rights" as: "all rights *(whether or not then held by the grantor)* which are of value at the time the rights to the patent (or an undivided interest therein) are transferred. \* \* \* [Emphasis added.]" Nor can petitioner come within the reasoning of the Sixth Circuit, in *Fawick v. Commissioner, supra* at 662, that it is not enough for the taxpayer merely to surrender the last vestiges of his rights, but rather that he must surrender to a transferee the entire bundle of monopoly rights evidenced by a patent (or an *undivided* interest in such rights).

---

[5] See also H. Rept. No. 1337, 83d Cong., 2d Sess. A279 (1954), and Summary of the New Provisions of the Internal Revenue Code of 1954 (H.R. 8300) as Agreed to by the Conferees 105 (1955), Staff of the Joint Committee on Internal Revenue Taxation. The latter, a contemporaneous summary, provides:

"The sale of an undivided interest in a patent which includes a part of each property right represented by the patent will also be deemed to give rise to long-term capital gains. On the other hand, a license limited geographically or limited to certain uses of the patent would not be considered a sale. The inventor could, of course, sell all the rights covered by, say, the United States patent while retaining foreign patents."

[6] See also *Estate of Klein v. Commissioner,* 507 F.2d 617, 621 (7th Cir. 1974), revg. 61 T.C. 332 (1973), cert. denied 421 U.S. 991 (1975).

The rationale of *Fawick v. Commissioner, supra,* and the regulations is consistent with both the statute and its legislative history. Section 1235 permits capital gains treatment upon the sale of "all substantial rights," not, as petitioners would have us read it, upon the sale of all rights still possessed by the holder. Petitioner did not sell "all substantial rights" in the patent to Ever-Level, but only those rights he still retained. It was the clear intent of Congress, as illustrated previously in this dissent, to give capital gains treatment only to outright sales of patents and not to those who chose to exploit them through piecemeal dismemberment. Finally, there is no basis either in the statute or the legislative history upon which to make a principled distinction between the last sale conveying the holder's remaining rights and previous use-restricted licenses.[7]

---

[7] It is no answer to say that a nonholder might qualify for capital gains under certain circumstances. We are here concerned with a "holder" and only with sec. 1235 (see n. 4 of majority opinion). A professional inventor clearly can look only to sec. 1235; amateur inventors are similarly restricted since Congress clearly stated there was to be "no distinction" between the two. H. Rept. No. 1337, 83d Cong., 2d Sess. 82. It is true that someone else may hold similar property in a different capacity not covered by sec. 1235 and qualify for capital gains on the sale of a patent. But these are not the circumstances we confront. As to the facts before us the regulation is clear and by no stretch of the imagination can we say it is unreasonable and plainly inconsistent with the statute.