**GREAT PLAINS CHEMICAL COMPANY, INC., Plaintiff,**

v.

**MICRO CHEMICAL, INC., Defendant.**

Civ. A. No. 80–F–63.

United States District Court, D. Colorado.

July 30, 1985.

Robert C. Dorr, Burton and Dorr, Denver, Colo., Carter H. Kokjer, Kokjer, Kircher, Bradley, Wharton, Bowman and Johnson, Kansas City, Mo., for plaintiff.

Richard W. Daily, Thomas H. Suddath, Jr., Davis, Graham and Stubbs, Denver, Colo., James S. Leigh, Klarquist, Sparkman, Campbell, Leigh & Winston, Portland, Or., for defendant.

## MEMORANDUM OPINION AND ORDER

SHERMAN G. FINESILVER, Chief Judge.

IN THIS ACTION, plaintiff seeks a declaratory judgment regarding the validity of U.S. Patents No. 3,437,075 ('075 patent), 3,498,311 ('311 patent), and 3,670,923 ('923 patent). Defendant, owner of the patents, counterclaimed, asserting plaintiff infringed the patents. Upon consideration of the evidence presented at trial, we are of the view the patents are valid and infringed. The following encompasses the Court's Findings of Fact and Conclusions of Law.

## BACKGROUND

The patented equipment involved in this case was invented by Roland J. Hawes. The Hawes patents embody a method and apparatus enabling a feedlot operator to custom formulate different feed supplement mixtures from selected feed supplement additives for each batch of feed. The additives include vitamins, minerals, proteins, antibiotics, medicines, etc. This method allows for mixing of the micro-ingredients just prior to each batch of feed being delivered to the livestock. It avoids the previous disadvantages of the commercial premixes.

The subject matter of the '075 patent is a system and method for adding micro-ingredient feed additive supplements to the feed or drinking water of livestock and poultry. Prior to the '075 method, the conventional way of supplying micro-ingredient feed additives to these animals was to premix selected additives in dry concentrate form. Typically, the additive premix was manufactured by commercial feed mills. The premixes were either mixed with a feed ration at the commercial mill or bagged separately. The feedlots purchased the

mixes and stored them until ready for use. If bagged, the premix was mixed with the feed ration at the feedlot or fed separately to the animals.

The premix method presented several problems. Some incompatible additives could not be premixed with each other even in the presence of a filler and, therefore, had to be manufactured, handled and stored separately. It was difficult to ensure that each animal received a desired formulation and dosage of specific additives. The ingredients often lost potency due to chemical breakdown or spoilage. Handling and storing the premixes in the large quantities required created expense and inconvenience.

The '075 patent solved these problems by creating a method whereby the additives could be stored separately at the feedlot. Then, through the process of the Hawes equipment, the micro-ingredients could be measured and then dispensed separately but simultaneously. The additives are mixed with a liquid carrier and delivered directly to the animals. The apparatus minimizes chemical interaction between the additives because the additives are stored separately in concentrate form and are not intermixed until added to a diluting flow of carrier fluid shortly before delivery to the feed ration. The equipment allows the feedlot operator to custom formulate additive combinations to meet the various needs of the livestock.

The subject matter of the '311 patent is an apparatus similar to the appartus in the '075 patent. The equipment was the first capable of dispensing separately but simultaneously both dry and liquid additive concentrates. It also handled both soluble and insoluble additives. Before this invention, others had tried dispensing premixed liquid concentrate additive solutions through livestock drinking water systems. Several problems arose, however. Biochemical additives lost potency when placed in concentrated solutions of mineral additives. Including soluble additives or additives of limited solubility in the slurry proved to be impracticable.

The subject matter of the '923 patent is an improved control system for a machine such as shown in the '075 and '311 patents which meters and dispenses multiple ingredients. This allowed technically untrained operators to adjust and change formulations accurately. A preprogrammed punch plate is used to achieve the desired concentrations and dispersals of the additives. The patent also added a flush system to ensure later batches would not be contaminated by any residual material left in the apparatus.

In 1982, this case was tried before a jury. The jury found the patents to be valid but could not reach a verdict on the issue of infringement. The verdict on validity was a nullity because of the inability of the jury to reach an agreement regarding infringement. A new trial was ordered as a result. The previous trial was before another federal judge. By random draw, the case was reassigned to this judge for trial de novo.

## FINDINGS OF FACT

I. Validity.

At the time of the Hawes patents, those involved with the feedlot business had extensive knowledge of the problems of feed and additives. Yet, they had a relatively low level of technical or mechanical skill. This is the level of ordinary skill in the pertinent art to be considered.

### A. The '075 Patent.

The pertinent art to which the Hawes patents and accused equipment relate is the art of dispensing and delivering micro-ingredient feed supplements to livestock. Although the dispensing of dry or liquid additives into a fluent carrier for mixing of the ingredients with the carrier and delivery to a destination for consumption was not new at the effective filing date of the '075 patent, July 15, 1965, it was new to the livestock business.

The machines made in accordance with the Hawes patents have been commercially successful. They have continued to grow in popularity after defendant's acquisition

of the business to the extent that over 150 machines are presently leased out to major cattle feedlots.

At the time the inventions of the Hawes patents were made, there was a long standing problem with the then existing systems for handling and delivering feed additives to livestock and other domesticated animals. Therefore, a long felt need for the kind of apparatus invented by Hawes existed, and others had failed to develop solutions.

Plaintiff raises an obviousness defense in challenging the validity of the '075 patent. Plaintiff relies principally on two references to support its obviousness defense, the Callahan Patent, 2,802,599 (plaintiff's exhibit 19) and a Jordan Publication (plaintiff's exhibit 35).

The Callahan patent, issued August 13, 1937, discloses a machine and method for making and vending beverages, such as coffee. Water is introduced into a mixing vessel and, while it is flowing through, predetermined amounts of dry ingredients, for example coffee or sugar are metered separately and simultaneously into the flow. No indication from the patent is made as to whether intermixing of the ingredients occurs before they are dissolved in the hot water. The patent does not claim the method of simultaneous dispensing is necessary to the operation of the machine. It is questionable whether a person of ordinary skill in the art of delivering micro-ingredient additives to livestock would look to Callahan or other references in the beverage vending area to solve his problems. Such art is far removed from the additive delivering art.

The Jordan publication does not relate to micro-ingredient feed additives at all. It discloses only a system for pre-blending bulk granular or liquid materials, such as livestock feeds, as might occur in a commercial feed mill. One portion of the publication shows a system for premixing dry livestock feeds on a conveyer belt. Each metering device is started and stopped sequentially, not simultaneously.

Neither Jordan nor Callahan describes storing separately quantities of feed additives in concentrated form, directing a portion of a fluent carrier flow to a location for receiving additives, merging the additive bearing portion of the flow with the remaining flow or directing the total flow to the receiving station. In addition, Jordan does not teach or suggest the use of a fluent carrier for any purpose. Callahan and Jordan, taken separately or together do not teach or suggest the entire combination of claim 12, the first challenged claim.

As to claim 14, neither the Callahan nor the Jordan information teaches or suggests the separate storage without intermixing of multiple additive supplements in concentrate form, the provision of a quantity of livestock consumptive carrier material in fluent form, nor the separate but simultaneous measuring of predetermined amounts of additive concentrates and dispensing the same separately but simultaneously into a flow of fluent carrier. In addition, Jordan does not teach or suggest the step of measuring separately but simultaneously and dispensing separately but simultaneously any material toward a flow of fluent carrier. The Jordan materials are premixed and do not use a fluent carrier as required in claims 12 and 14. Callahan and Jordan, taken separately or together, do not teach or suggest the combination, as a whole, recited by claim 14. Therefore, such references also do not teach or suggest the entire combination of claims 15, 17 and 18.

### B. The '311 Patent.

In contesting the validity of the '311 patent, plaintiff relies principally on the disclosure in the abandoned parent application of the '075 patent (plaintiff's exhibit 13), the Jordan publication (plaintiff's exhibit 35), the Callahan patent (plaintiff's exhibit 19), and Bowman U.S. Patent No. 2,462,019 (plaintiff's exhibit 17) in challenging the validity of claims 2, 3 and 5 of the '311 patent. The patent was issued on March 3, 1970.

The patent office considered the subject matter of the abandoned parent application as well as numerous other references. The '311 patent not only refers to such parent application, but identifies the limitations of the system shown and described in such application.

The abandoned parent application of the '075 patent does not teach any of the claimed elements relating to the dispensing of liquid additive concentrates. Nor does it suggest any means for dispensing separately but simultaneously multiple liquid additive concentrates and multiple dry additive concentrates into a liquid carrier as described by claim 2.

The Callahan and Jordan materials do not teach or suggest that the disclosed equipment or its components should be or could be used in any connection with feed additive concentrates. Further, Callahan does not suggest a dispensing means having a dispensing member rotatable at a variable speed. Callahan and Jordan also do not teach separate means for handling both liquid ingredients and dry ingredients of any type, in combination.

The references do not discuss a means of positioning the dry dispensing means and liquid passages to permit the simultaneous dispensing of multiple liquids and drys of any type into a flowing carrier without intermixing before they enter the carrier. Callahan and Jordan, therefore, do not teach or suggest the claimed combination, as a whole.

The Bowman patent does not describe any of the elements relating to the handling of feed additive concentrates. Bowman fails to describe any structure for handling dry materials of any kind for any purpose. This patent also does not teach the separate but simultaneous dispensing of any multiple ingredients into a common carrier.

■ The abandoned parent application, Callahan, Jordan and Bowman, considered separately or together, do not teach or suggest the combination, as a whole, recited by claim 2. Accordingly, such references also do not teach or suggest the entire combinations of claims 3 and 5.

### C. The '923 Patent.

Plaintiff relies on the '075 patent (defendant's exhibit D), Belaieff U.S. Patent 3,227,818 (plaintiff's exhibit 30), Launbranch U.S. Patent 1,339,566 (plaintiff's exhibit 16), and the Jordan publication (plaintiff's exhibit 35) in challenging the validity of claims 1, 2, 3, 4, 13, 18, and 19 of the '923 patent. The patent issued June 20, 1972.

The plate control claims of the '923 patent generally cover the combination of a control means having preprogrammed plate type formulating members with the various components of a multiple ingredient dispensing apparatus. Claim 1 is the only independent claim of the group of claims. Essentially, it recites the combination of a plural ingredient supply means, an electric motor-driven metering means, and a control means for controlling the operation of said metering means. The claim then proceeds to more specifically describe the control means as being a remote control electrically connected to the various motors, which has at least one selector switch for each motor. The switches are operable separate from any other switch and the actuators for the switches are physically grouped together. The apparatus includes preprogrammable plate-type formulating members selectively positionable over the actuators. The particular formulation defined by the holes in the particular plate used is dispensed by the equipment.

The principal feature of novelty which was argued to the patent office examiner was the presence of multiple, interchangeable preprogrammed plate type formulating members. These members are selectively positionable over a common group of actuators to determine the formulation of the various ingredients dispensed.

Both the '075 patent and the '311 patent are discussed in the '923 patent. The invention of the '923 patent is described as an improvement in the control systems of such prior patents. We assume the patent

office examiner read the application for the '923 patent and considered the prior art '075 and '311 patents. These patents are more relevant than any of the other prior art submitted by the plaintiff.

The Belaieff patent shows a rigid plate type control for use with household appliances. The plate control fits over a group of switch actuators and determines which switch actuators are to be operated. Similarly, the Launbranch patent shows a plate type control which determines which lights on a signboard are to be lit.

The card reader control disclosed in the Jordan materials is an electronic control system for selecting bulk ingredient formulations. The control described has no application to the equipment operated by the plaintiff or defendant.

At the time of the Hawes invention, plate-type controls had been available for many years in other fields. But, they had never been used in a multiple ingredient dispensing application to determine formulations. Nor had they been used to solve the problems associated with prior micro-ingredient feed additive dispensing machines.

In addition, the patent office considered the relevant Manning U.S. Patent 2,431,058 (defendant's exhibit T). This patent discloses a card-type control for determining the formulation produced by a multiple-ingredient dispensing apparatus.

The '075 and '311 patents do not discuss a control, as described in claim 1, for the multiple metering motors of a dispensing apparatus. These references do not show the entire combination of claim 1.

The controls of Belaieff and Launbranch are not suggested for use in controlling the selection of multiple metering motors of a multiple ingredient dispensing machine to control ingredient formulation, as described in claim 1. More specifically, Launbranch and Belaieff do not teach or suggest the following: a remote control means connected in an electrical circuit to various motors of a motor driven metering means, remote control including multiple selector switch means including one for each motor, the selector switch means being operable to energize the motors independently of the others, or multiple interchangeable preprogrammed plate-type formulating members which themselves are positionable over the common group of actuators to determine actuation of preselected actuators as required in claim 1. Similarly, the Jordan publication does not teach or suggest the details of claim 1.

The Belaieff, Launbranch, '075 and '311 patents and the Jordan publication, taken individually or together, do not teach or suggest the combinations, as a whole, of claims 2–4, 13, 18, and 19.

Plaintiff also challenges the validity of claims 23–25 of the '923 patent. Plaintiff relies on the '075 patent, Sloier U.S. Patent 2,800,152 (defendant's exhibit PPP) and a 1960 transcript of a Feed Institute meeting (plaintiff's exhibit 36).

The Sloier patent shows a coffee dispenser with a flush cycle. The '075 patent describes the additive storage and metering elements of claim 23. The patent office considered both of these references in authorizing claims 23–25. The transcript only generally discusses the use of a variable timer and variable feed rate with reference to the manufacture of animal feeds in a commercial feed mill. The transcript neither describes nor discusses the Hawes concept of letting the feedlot operator custom-formulate his own batches of micro-ingredient additives, using additive concentrates dispensed separately and simultaneously into a liquid carrier flow, which is then delivered to the animal feed.

None of these references, taken separately or together, discloses or suggests the entire combination of elements as claimed. More specifically, the '075 patent discloses neither the flush cycle nor the variable timer required by claim 23. The Sloier patent discloses none of the elements of claim 23 relating to the handling of feed additive supplements. The 1960 transcript does not describe the above nor does it reveal the use of a liquid carrier for any material, nor the use of a flush cycle as described in claim 23.

## II. Infringement.

The defendant alleges several claims of each of the three patents are infringed by the plaintiff. Defendant argues the plaintiff's feed additive dispensing system operates on the same or substantially the same principles claimed by the Hawes patents. The system stores separately and then dispenses both liquid and dry micro-ingredient concentrates. The concentrates are dispensed separately and simultaneously into liquid in a receiving tank. The fluid flows continuously through the storage tank, receiving tank, and finally to the carrier receiving station.

### A. The '075 Patent.

■ Defendant alleges infringement of claims 12, 14, 15, 17 and 18 of the '075 patent, and argues the elements of each claim are found in the plaintiff's equipment. With respect to claim 12, paragraph (a), plaintiff's equipment directs a flow of water from the water storage tank along a predetermined path to a carrier receiving station. The first portion of such flow is pumped by the booster pump through the fill line into the additive receiving tank. (defendant's exhibit UUU, VVV) The flow, when in the receiving tank, is recirculated in a turbulent manner by rotating vanes until discharged from the tank. Measured amounts of different additives are separately but simultaneously discharged into the recirculating flow, within the receiving tank, by the variable speed dry feeders and variable stroke metering pumps, as described by claim 12. (defendant's exhibit VVV) Each additive concentrate is stored separately in concentrate form in its own individual container before being dispensed into the water as required by paragraph (b) of claim 12. Also, plaintiff's system meets the merging step of paragraph (f) of the claim. As required by paragraph (g), the total flow is directed from the additive receiving tank to the feed truck batch mixer. The variable timer can be adjusted to cause merger of the flush flow portion and additive bearing flow portion either in the receiving tank or in the discharge line leading from such tank.

We find that plaintiff's method performs the same function in substantially the same way as the method of claim 12, to produce the same result. Therefore, claim 12 is infringed under the doctrine of equivalents.

The only contested elements of claim 14 are those described in paragraphs (c) through (f). The remaining uncontested elements are found in plaintiff's method for the reasons indicated in the discussion of claim 12.

Plaintiff's machine induces a continuous flow of the water carrier toward the carrier receiving station. This effect is accomplished by pumping water carrier from the water tank into the receiving tank where it is recirculated to dilute and suspend the additives. Then the additive bearing carrier is pumped to the carrier receiving station, as required by paragraph (c). Thus, flow occurs while the additives are measured and dispensed. Plaintiff's method meets the continuous flow limitations of claim 14. Throughout the period of flow, the additive supplements are carried continuously by the flow in concentrations that do not exceed predetermined maximum levels as further required by paragraph (f). Moreover, plaintiff's practice of controlling the volume and rate of fluent carrier through the system equates with the "controlling [the] flow" requirements of claim 14.

Plaintiff's method performs the same function in substantially the same way as the method of claim 14, to produce the same result. Claim 14 is infringed under the doctrine of equivalents.

Claims 15, 17, and 18 are dependent on claim 14. Claim 15 recites that the fluent carrier is water which is what plaintiff uses. Claim 17 provides for the independent changing of the predetermined dispensing rate of one or more additives without changing the dispensing rates of the other additives between flow periods. This method can be accomplished by plaintiff's machine by changing the speed of one or more rotary feed motors in the case of dry

additives, and by changing the stroke of one or more metering pumps for liquid additives. Claim 18 recites that the fluid carrier is a nonviscous liquid and the additive concentrates are in noncohesive dry particulate form and dispensed by gravity, as is the case with plaintiff's system. Therefore, claims 15, 17, and 18 are also infringed.

### B. The '311 Patent.

■ Claims 2, 3, and 5 of the '311 patent are alleged to be infringed. The only significant difference between the '311 patent and the '075 patent, at least concerning claim 2 of the '311 patent, is that claim 2 includes liquid additive handling components as well as those for dry ingredients.

Plaintiff's equipment dispenses the dry and liquid additive concentrates separately but simultaneously into the water carrier which is conveyed along a predetermined path that includes an additive receiving section, batch mixer or receiving tank. The plaintiff's equipment has several containers for storing separately the dry and liquid additives as well as dispensing members beneath the dry additive bins. These elements, paragraphs (a) through (e) and (h) through (l) are not contested by plaintiff as being a part of their equipment.

The elements of paragraphs (f), (g) and (m) are also found in plaintiff's equipment. The passage means of paragraph (f) corresponds to the liquid ingredient lines leading from the liquid ingredient storage tanks to the additive receiving tank in the plaintiff's machine. The variable stroke pump is the means for inducing the flow of liquid concentrate from the liquid tank to the receiving tank. Each metering pump has a variable stroke control to vary the output or rate of flow of the liquid concentrate from its storage tank through the liquid ingredient line, as described by paragraph (g).

As for paragraph (m), simultaneous dispensing of the separate additives is made possible by the ability of the dry additive rotary feeders and liquid additive metering pumps to operate simultaneously. The feeders and liquid ingredient lines empty downwardly into the receiving tank at different locations such that the ingredients flow by gravity into the tank without intermingling. (defendant's exhibit NN–3).

Plaintiff's variable stroke pump apparatus is equivalent to the gravity liquid additive delivery system shown in the '311 patent. Nothing in the prosecution history is inconsistent with this finding.

With respect to paragraph (m) of claim 2, it is clear from the remarks made during the prosecution of the patent (plaintiff's exhibit 5) that the asserted significance of the flowing through language is that the additive concentrates are dispensed into a flowing diluting fluent carrier. None of the references to which such remarks were directed taught dispensing multiple dry and liquid concentrates separately, without intermingling, into a diluting fluent carrier. Plaintiff's diluting fluent carrier which flows within the receiving tank is the equivalent of the constant flow system illustrated in the '311 patent.

Plaintiff's equipment performs the same function in substantially the same way as the apparatus of claim 2, to produce the same result. Claim 2 is infringed by the doctrine of equivalents. Dependant claims 3 and 5 are literally infringed by plaintiff's machine. Each and every limitation of these claims is found in plaintiff's equipment. Plaintiff's apparatus has solenoid valves in the liquid concentrate lines for independently controlling the rate of flow of the concentrates through such lines. It also has switches for controlling the solenoid valves to permit selective shut-off of the flow in the lines.

### C. The '923 Patent.

■ Defendant asserts that claims 1, 2, 3, 4, 13, 18, 19, 23, 24, and 25 of the '923 patent are infringed. This patent concerns the improvement on the control systems for the apparatus of the '075 and '311 patents. Plaintiff does not contest the allegations of infringement of claims 1, 2, 3, 4, 13, 18, and 19 which involve the plate control of the device.

Regarding claim 23, plaintiff does not contest that the elements of paragraphs (a), (b), (c), (e) and (f) are found in its equipment. Plaintiff's machine includes dry concentrate storage bins and liquid concentrate containers as described in (a). The separate metering motors associated with each bin and container as provided in (b) are included as well as a conduit for receiving dispensed additives as listed in (c). Plaintiff's equipment also includes a multiple selector switch type control to determine the operation of the metering motors and thus the formulation of the dispensed additives which paragraphs (e) and (f) describe.

We find the limitations of paragraphs (d), (g) and (h) are also found in plaintiff's equipment. The flow inducing means described in (d) includes the feed pump or booster pump in the water supply line leading to the receiving tank, the impeller-type vane mixer in the receiving tank and the discharge pump in the discharge line. These all cooperate to induce the flow of liquid carrier from the water storage tank, through the receiving tank, to the feed truck mixer. With regard to (g) of claim 23, plaintiff's equipment has two variable timers. (defendant's exhibit NN-1, OO-3, and OO-5) As for paragraph (h), at the end of the additive metering operation, the discharge cycle of the machine is initiated, either automatically or manually by activating the discharge pump. When the slurry in the receiving tank drops below a certain level, the flush cycle is automatically triggered. This causes the booster pump to pump flush water from the storage tank through the flush line and flush nozzles into the top of the receiving tank and also through the fill line. Flushing stops automatically after the tank and all lines have been flushed with clean water. The flush start and stop functions are controlled automatically by variable timers. One or another of the three components of the flow inducing means continues in operation after metering stops and until the end of the flush cycle. The receiving or mixing tank of the plaintiff's equipment is the equivalent of a conduit and the booster pump,

mixing vanes and discharge pump are collectively flow inducing means for inducing a flow of liquid carrier through the conduit. This system is the equivalent of the system recited in claim 23.

These findings are consistent with the file history of the patent. (plaintiff's exhibit 8) With respect to the fluent carrier, the emphasis during prosecution of the patent was that the additives are dispensed into a moving or flowing carrier. Regarding the timer means and flush cycle limitations, the history does not indicate that the flush cycle must begin immediately after the end of the metering cycle. The plaintiff's flush cycle system uses substantially the same means in substantially the same way to achieve the same result as the system of defendant's equipment.

Plaintiff's equipment has a control operable to de-energize selected metering motors once the variable timer has timed out and to reset the variable timer to a starting condition upon completion of an operating cycle as required by claims 24 and 25. Therefore claims 24 and 25 are infringed. Claim 23 is infringed under the doctrine of equivalents.

## CONCLUSIONS OF LAW

Jurisdiction is proper in this declaratory judgment action for validity and non-infringement of the patents in question pursuant to 28 U.S.C. §§ 2201 and 2202 and 28 U.S.C. § 1338.

■ An invention must be useful, novel and nonobvious to be patentable according to 35 U.S.C. §§ 101–103. Section 103 provides:

A patent may not be obtained through the invention is not identically disclosed or described as set forth in Section 102 of this title, if the differences between the subject matter sought to be patented and prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

In addition, when validity is challenged, a presumption of validity is provided by 35 U.S.C. § 282. Included within this concept is a "presumption of non-obviousness which the patent challenger must overcome by proving facts with clear and convincing evidence." *Perkin-Elmer Corp. v. Computer Vision Corp.*, 732 F.2d 888, 894 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984). The facts must show invalidity by clear and convincing evidence. The burden of persuasion lies with the patent challenger. *Jones v. Hardy*, 727 F.2d 1524 (Fed.Cir.1984).

■ The strong statutory presumption of validity may be weakened if the patent examiner failed to consider the relevant prior art. *Lam, Inc. v. Johns–Manville Corp.*, 668 F.2d 462 (10th Cir.), *cert. denied*, 456 U.S. 1007, 102 S.Ct. 2298, 73 L.Ed.2d 1302 (1982); *Norfin, Inc. v. International Business Machines, Corp.*, 625 F.2d 357 (10th Cir.1980). Introduction of prior art more relevant than the art the patent examiner considered does not, however, destroy the presumption of validity. *Leinoff v. Louis Milona and Sons, Inc.*, 726 F.2d 734 (Fed.Cir.1984).

The determination of the scope of the prior art as well as the difference between the prior art and the claims in issue are questions of fact. *Escoa Fintube Corp. v. Tranter, Inc.*, 631 F.2d 682 (10th Cir.1980); *Norfin v. International Business Machines, Corp.*, 625 F.2d 357 (10th Cir.1980). The question of obviousness is also a factual determination. *Id.*

■ In determining obviousness, the question is whether a person of ordinary skill in the art, having all the teachings of the relevant references before him, could produce the item defined in the claim. The person of ordinary skill in the art is presumed to have knowledge of only the relevant art in existence at the time of the invention. *Orthopedic Equipment Co., Inc. v. United States*, 702 F.2d 1005 (Fed.Cir.1983). The nature of the problem confronting the inventor must be considered in evaluating the relevant art of claims of

patents which are being challenged on grounds of validity. *Id.*

■ The scope and content of the prior art is to be determined in applying the nonobviousness test of 35 U.S.C. § 103. The differences between that art and the claims are to be evaluated. In addition, the level of ordinary skill must be considered. *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Secondary considerations, including commercial success, long felt need and the failure of others to solve the problem must be addressed as well. *Radio Steel and Manufacturing Co. v. MTD Products, Inc.*, 731 F.2d 840 (Fed.Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed.Cir.1983); *In re Sernaker*, 702 F.2d 989 (Fed.Cir.1983); *Lam, Inc. v. Johns-Manville Corp.*, 668 F.2d 462 (10th Cir.), *cert. denied*, 456 U.S. 1007, 102 S.Ct. 2298, 73 L.Ed.2d 1302 (1982).

The claims of the '075, '311, and '923 patents encompass a combination of elements and steps. The subject matter as a whole must be considered. *Radio Steel Manufacturing Co. v. MTD Products, Inc.*, 731 F.2d at 846; *Ralston Purina Co. v. Far-Mar-Co., Inc.*, 586 F.Supp. 1176 (D.Kan.1984). Nearly all inventions are a combination of elements or steps. *Connell v. Sears Roebuck and Co.*, 722 F.2d 1542 (Fed.Cir.1983). There must be some indication in the prior art of the obviousness of making the combination. *Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick*, 730 F.2d 1452 (Fed.Cir. 1984).

The level of skill in the art of handling and administering feed additives at the time of the '075, '311, and '923 patents, and the differences between the prior art and the asserted claims of the patents are such that the claimed combinations, as a whole would not have been obvious to a person of ordinary skill in the art. *Graham v. John Deere Co.*, 383 U.S. at 17, 86 S.Ct. at 693. Further, consideration of the commercial success of the equipment in the livestock industry as well as the failure of others to

solve the problem of prior methods lends support to the validity of the claims. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1538; *In re Sernaker*, 702 F.2d at 996. Plaintiff failed to prove by clear and convincing evidence that the asserted claims in the patents were invalid. *Railroad Dynamics v. A. Stucki Co.*, 727 F.2d 1506 (Fed.Cir.1984).

It must be assumed that the abandoned parent application No. 427,207 of the '075 patent was considered by the patent examiner in evaluating claims 2, 3, and 5 of the '311 patent. *Teledyne McCormick Selph v. United States*, 192 U.S.P.Q. 55 (Ct.Cl.1976). Also, it must be assumed that the patent examiner read the application for the '923 patent and considered the prior art '075 and '311 patents before allowing the claims of the '923 patent. *Id.*

■ Infringement is defined in 35 U.S.C. § 271(a) as follows: "whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." The asserted claims of the patent must be compared with the products or process of the accused equipment. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476 (Fed.Cir.), *cert. denied*, 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984). That comparison can only be performed in view of the claims, the file history, and the prior art. *Graham v. John Deere*, 383 U.S. at 33, 86 S.Ct. at 701. Infringement is not avoided by adding an additional element nor because the accused device is more or less efficient than the patented machine. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d at 1482.

■ The patent owner must prove infringement by a preponderance of the evidence. When a device literally contains all of the elements in the claim or an equivalent therefor, the device infringes the claim. *Radio Steel Manufacturing Co. v. MTD Products, Inc.*, 731 F.2d at 847.

■ In instances where literal infringement does not exist, the patentee can be protected under the doctrine of equivalents. This doctrine provides that in cases where an accused device employs substantially the same function in substantially the same way to achieve the same result, the device infringes the patent. *Graver Tank Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The test of equivalency goes beyond what is literally stated in the patentee's specification to be equivalent and encompasses any element which one of ordinary skill in the art would view as interchangeable with the claimed element. *Thomas and Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572 (Fed.Cir.1983). The doctrine of equivalents may be limited by prosecution history estoppel, also known as file wrapper estoppel. This precludes a patentee from taking an inconsistent position regarding a claim from the position taken during prosecution of the claim, in order to support the charge of infringement. *Thomas and Betts Corp. v. Litton Systems, Inc.*, 720 F.2d at 1579.

The application of file wrapper estoppel is not necessary in this action. The amendments or arguments made during the prosecution of the '075, '311, and '923 patents are not inconsistent, nor are they limiting, with respect to a finding that plaintiff's equipment and method are equivalent to the claimed subject matter.

Claims 12, 14, 15, 17 and 18 of the '075 patent are infringed under the doctrine of equivalents. Claim 2 of the '311 patent is infringed under the doctrine of equivalents. Claims 23–25 of the '923 patent are infringed under the doctrine of equivalents. *Thomas and Betts Corp. v. Litton Systems, Inc.*, 720 F.2d at 1579. Claims 1–3, 13, 18, and 19 of the '923 patent, as well as claims 3 and 5 of the '311 patent, are literally infringed because each and every element of such claims is found in plaintiff's equipment. *Radio Steel Manufacturing Co. v. MTD Products, Inc.*, 731 F.2d at 847.

## ORDER

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that U.S. Pat-

ents Nos. 3,437,075, 3,498,311 and 3,670,923 are valid;

IT IS FURTHER ORDERED that claims 12, 14, 15, 17 and 18 of U.S. Patent No. 3,437,075, claims 2, 3, and 5 of U.S. Patent No. 3,498,311, and claims 1–3, 13, 18, 19, and 23–25 of U.S. Patent No. 3,670,923 are infringed.

IT IS FURTHER ORDERED that the parties are to file statements regarding damages within 10 days of the date of this order;

IT IS FURTHER ORDERED that pursuant to Rule 54(b), and the Court finding there is no just reason for delay, the Clerk of the Court is directed to enter judgment in favor of the defendant and against the plaintiff. Plaintiff is to pay all costs.

## APPENDIX

*'075 Patent*

12. A method of administering feed additives to livestock comprising the steps:

(a) directing a flow of fluent carrier material along a predetermined path to a carrier receiving station,

(b) storing separately quantities of several different feed additives in concentrated form,

(c) measuring separately but concurrently predetermined amounts of said different feed additives,

(d) directing a portion of said flow to a location for receiving said additives,

(e) discharging said measured amounts of different additives separately but simultaneously into said portion of said flow,

(f) merging the additive-bearing said portion of said flow with the remaining flow,

(g) and then directing the total said flow, including the additive-bearing portion, to said receiving station.

14. A method of administering feed additive supplements to livestock with optimum effectiveness comprising the steps:

(a) storing separately and without intermixing until just prior to the time of intended consumption several different additive supplements in concentrate form,

(b) providing a quantity of livestock consumptive carrier material in fluent form,

(c) just prior to the time of intended use, inducing a continuous flow of the fluent carrier toward a carrier receiving station,

(d) during the period of said flow only, measuring separately but simultaneously predetermined amounts of said several additive supplement concentrates from their separate storage stations and dispensing the same separately but simultaneously toward said flow of fluent carrier material,

(e) and further during said period of flow only, causing the several previously measured and dispensed said additive supplement concentrates to enter said flow of fluent carrier at separated points along said flow, thereby maintaining the separation of said several additive supplement concentrates until they enter said flow,

(f) throughout said period of continuous flow, controlling said flow so as to maintain at least a predetermined minimum rate of flow past the points at which said concentrates are added and to said receiving station, so that throughout said period of flow said additive supplements will be delivered continuously in said flow to said receiving station in concentrations that do not exceed predetermined maximum levels,

(g) and then presenting the additive supplement-bearing carrier ration to livestock for consumption,

(h) whereby several additive supplements may be fed simultaneously to said livestock at predetermined dosages within a short time after intermixing said supplements within the diluting fluent carrier so that said several supplements are consumed by the livestock with a minimum potency loss.

15. The method of claim 14 wherein the fluent carrier material is water.

17. The method of claim 14 including changing the predetermined rate of dispensing of one or more of said additive supplement concentrates without changing the rate of dispensing of all of the other

said several additive concentrates between periods of flow so as to change the dosages of said one or more supplements delivered to the livestock.

18. The method of claim 14 wherein said fluent carrier is a nonviscous liquid and several additive supplement concentrates are in noncohesive dry particle form and said dry particle supplement concentrates are dispensed by gravity into said flow.

### '311 Patent

2. Apparatus for dispensing both dry and liquid feed additive concentrates into a fluent carrier material comprising:

(a) means for conveying said fluent carrier material in a predetermined path, said path including an additive-receiving portion,

(b) dry additive concentrate storage means positioned above said receiving portion,

(c) liquid additive concentrate storage means positioned adjacent said receiving portion,

(d) dry additive concentrate dispensing means positioned beneath said dry additive concentrate storage means and including a rotatable dispensing member,

(e) said dispensing member being rotatable at a variable speed to vary the rate of dispensing of dry additive concentrate,

(f) passage means leading from said liquid concentrate storage means to said receiving portion including means for inducing the flow of liquid concentrate from said liquid storage means through said passage means to said receiving portion,

(g) liquid flow control means for controlling the rate of flow of liquid concentrate from said liquid storage means through said passage means,

(h) and shutoff means for selectively preventing the dispensing of dry and liquid additive concentrates,

(i) said dry additive storage means including a plurality of separate additive container means for storing separately different dry feed additive concentrates,

(j) said liquid additive storage means including a plurality of separate liquid receptacle means for storing separately different liquid additive concentrates,

(k) said dry additive dispensing means including means for dispensing separately but simultaneously dry additive concentrates from each of said separate container means,

(l) said passage means including a plurality of different passages, one leading from each of said liquid receptacle means so as to enable dispensing separately but simultaneously into said receiving portion different liquid feed additive concentrates,

(m) and means positioning said dry additive concentrate dispensing means and said passages so as to permit the simultaneous, but separate dispensing of both dry and liquid feed additive concentrates into said receiving portion at the same time but without intermingling prior to entry into said fluent carrier material flowing through said receiving portion.

3. Apparatus according to claim 2 wherein said liquid flow control means includes independently operable control means in said separate passages for controlling independently the rate of flow of liquid concentrate through each said passage.

5. Apparatus according to claim 2 wherein said means for selectively shutting off said flow includes solenoid actuated valve means in said passage means and selector switch means for selectively activating said solenoid.

### '923 Patent

1. In a multiple ingredient dispensing apparatus including plural ingredient supply means, an electric motor-driven metering means for metering ingredients from each supply means, and control means for controlling the operation of said metering means and thereby controlling the formulation of ingredients dispensed comprising:

(a) remote control means connected in an electrical circuit to the various motors of said motor-driven metering means,

(b) said remote control means including multiple selector switch means including at least one for each said motor, a said selector switch means being operable to energize one of said motors independently of the other said motors, said multiple selector switch means including switch actuators arranged in a common bank;

(c) and multiple interchangeable pre-programmed plate-type formulating members selectively positionable over said common bank of actuators and including means cooperable with selected ones of said actuators to determine the actuation of preselected ones of said selector switch means and thereby operating certain ones of said motors to dispense a preselected formulation of said plural ingredients as determined by said plate-type formulating members.

2. A dispensing apparatus according to claim 1 including motor speed control means in said circuit for selectively operating at least certain ones of said motors at a plurality of different constant speeds to vary the proportions of ingredients dispensed,

at least some of said multiple selector switch means being operable to select the speed of operation of said certain ones of said motor so that said plate-type formulating means controls the proportions of ingredients dispensed as well as the kinds of ingredients dispensed.

3. Apparatus according to claim 1 wherein each said selector switch means includes a plunger actuator means, said plunger means for all said selector switches projecting from a common bank of said switches and being in prearranged positions at said remote control means, each said preprogrammed formulating member including a rigid plate adapted to overlie said plunger means, said plate having openings therethrough at preselected positions corresponding to the positions of at least some of said plunger means, said openings being larger than their corresponding said plunger means,

and plate-retaining means for maintaining said program plate in position overlying said plunger means under sufficient pressure to actuate preselected ones of said plunger means while others of said plunger means are in registration with said openings in said plate so as to remain in their unactuated extended positions.

4. Apparatus according to claim 3 wherein said remote control means comprises a box-like housing having a front face containing a master switch means, said common bank lying along a wall of said housing with said plunger means protruding therefrom, said plate-retaining means including a cover plate hinged to said housing and including clamping means for clamping said cover plate to said housing in overlying relationship to said plunger means.

13. Apparatus according to claim 1 wherein said remote control means includes variable timer means selectively operable to time the interval of operation of said metering motors selected by said formulating member and thereby determine the length of a metering cycle.

18. Apparatus according to claim 1 wherein said control means includes speed control means in said circuit for operating at least certain ones of said metering motors at a plurality of different preselected constant speeds to vary selectively the metering rate of at least some of said metering means independently of the metering rate of others of said metering means, at least some of said selector switches being operably connected to said speed control means in a manner so as to select the speed of operation of a metering motor as well as to select the metering motor to be operated.

19. Apparatus according to claim 18 wherein at least one of said metering motors is operably connected to one of said speed control means, said one speed control means being selectively operable to operate said one metering motor at at least two different constant speeds, at least two different ones of said selector switches being operably connected to said one metering motor and to said one speed control means in a manner so that one of said two

switches is operable when activated to operate said one motor at a first constant speed and so that the other of said two switches is operable when activated to operate said one motor at a second constant speed.

23. In a machine for metering and dispensing multiple micro-ingredient concentrates into a liquid carrier for use in the formulation of livestock or poultry feed in a feed mill,

(a) multiple container for storing separately quantities of different micro-ingredient concentrates,

(b) a separate metering means for metering concentrates from each said container including a separate metering motor for each said metering means,

(c) a conduit for receiving concentrates dispensed by said metering means,

(d) flow-inducing means for inducing a flow of liquid carrier through said conduit to carry said concentrates to said feed mill,

(e) and control means for controlling the operation of said machine comprising:

(f) multiple selector switch means operable when selectively actuated to determine the operation of said metering means and thus the formulation of micro-ingredients dispensed,

(g) variable timer means operable to determine the length of an operating cycle of said metering means selected by said selector switch means,

(h) and means automatically operable at the end of an operating cycle to provide a flush cycle through continued operation of said flow-inducing means for a predetermined length of time following discontinuance of metering.

24. A machine according to claim 23 wherein said control means includes means operable to de-energize the selected ones of said metering motors when said variable timer has timed out.

25. A machine according to claim 23 wherein said control means includes means for resetting said variable timer means to a

starting condition upon completion of an operating cycle.